F. H. HOLLINGSWORTH, Appellee, v. MIDWEST SERUM COMPANY et al., Appellants.

NEGLIGENCE: Negligence Per Se—Violation of Statute—Unauthorized Requirement—Hog Cholera. The Hog Cholera Serum Act, directing the director of the laboratory to establish the "standard degree of potency" of hog cholera serum, and prohibiting the sale of serum below such standard, authorizes a standard which calls for a "condition" of potency of the serum at the time it is offered for sale, and not a standard which calls for "results" *after it is administered to the animal.* *Held,* a standard which required a potency sufficient *to prevent a hog from contracting hog cholera* was unauthorized. (Sec. 2538-w *et seq.,* Code Supp., 1913.) It follows that the sale of serum below such unauthorized standard does not constitute a violation of the statute, and bring the seller within the rule that the violation of the statute constitutes negligence *per se.*

**NEGLIGENCE:**   Acts Constituting—Manufacture of Hog Cholera
2   Serum—Evidence.   Evidence reviewed, concerning the manufac-
ture and sale of hog cholera serum, and held insufficient to es-
tablish negligence.

*Appeal from Pottawattamie District Court.*—A. B.
THORNELL, Judge.

MAY 14, 1917.

REHEARING DENIED APRIL 2, 1918.

ACTION for damages for negligence in the manufacture
and sale of certain serum known as hog cholera serum.
The serum was manufactured and sold for·the purpose of
use as a preventive for hog cholera.   There was a verdict
for the plaintiff, and the defendants appeal.—*Reversed.*

   *Tinley, Mitchell, Pryor & Ross,* and *Arthur F. Mullen,*
for appellants.

   *Hess & Hess* and *Kimball & Peterson,* for appellee.

   EVANS, J.—I.   The Midwest Serum Company is a Ne-
braska corporation, doing business at Omaha, and engaged
in the manufacture and sale of certain products intended
to be used by inoculation as a preventative

1. **NEGLIGENCE:**   for hog cholera.   The defendants Juckniess
negligence *per*
*se*: violation   and Smylie are the president and secretary,
of statute: un-
authorized re-   respectively, of such corporation.   The pe-
quirement:
. hog cholera.   tition is in five counts, each count repre-
senting a separate and distinct cause of action against the
defendants.   These five causes of action accrued separately
to five different persons.   The first count represents a cause
of action originally accruing to the plaintiff himself, where-
as the other four causes of action were acquired by the
plaintiff by assignments.   The assignors are Koon, Benedix,
Walden, and Preston.   The plaintiff and Koon are practis-
ing veterinary surgeons, who separately purchased the cer-

tain serum from the defendant company. Each of them used the serum so purchased upon his own hogs, and claims to have been damaged thereby. The other three assignors are farmers, who were owners of herds of hogs, and who employed Koon to vaccinate the same. For that purpose, Koon used the serum purchased from the defendants, with a resulting damage to each, as claimed. The claim of negligence is bottomed principally upon the theory that the defendant company put upon the market a serum which was not of a sufficient potency to counteract the virus of hog cholera, and that thereby it violated a statute of the state of Iowa, and was, therefore, *ex necessitate* negligent, and that such negligence was the proximate cause of great loss to the plaintiff and his assignors, by reason of the loss of their hogs by cholera. So far as this question is concerned, the answer of the defendants was a general denial. An understanding of the facts in the case requires the aid of expert testimony, as regards the state of the art and science of cause and prevention of hog cholera as the same was understood and practised on and prior to July, 1914, the date of the sales in question. The expert testimony on both sides is not greatly in dispute at any point material to our consideration. The next paragraph hereof will be devoted to excerpts from the testimony, and to a setting forth in some detail of the facts, expert and otherwise, which are necessary to an understanding of the later discussion. Preliminary thereto, it may be said that the art of dealing with hog cholera has been developed by experimentation to a very considerable degree of success. The method is one of inoculation. Two agencies are used, one being known as the *virus* and the other as the *serum*. The virus contains the poison or active principle of cholera. The serum contains the principle of immunity, or antidote to the poison. The theory is that, if a hog be exposed to the infection of cholera, the development of cholera from such infection will be neu-

tralized and prevented by immediate inoculation with the antidote serum. It is essential to the effectiveness of the antidote that it be administered immediately after the infection of the poison, and at least within two days. The method of treatment, therefore, is to inoculate the hog in different parts of his body with the virus and the serum at the same time. If the treatment works successfully, the hog passes through a period of reaction or fever and recovers, and is thereafter immune from cholera. Under the terminology of the art, the hog which has passed through such treatment is called an *immune* hog; whereas one which has never passed through such treatment, and which has never had the cholera, is known as a *susceptible* hog. The successful use of the serum is not necessarily dependent upon the *artificial* infection of the hog with the virus. If a hog were infected *naturally* by contact with cholera hogs, an immediate inoculation with serum would, theoretically, be sufficient to arrest and neutralize the cholera infection. The practical difficulty at this point is that it is impossible by any known method to discover the presence of cholera infection in its first stages. No symptoms appear until after several days of incubation. When the development has reached the stage of symptoms, it is too late to inoculate successfully. To inoculate in such case, therefore, is to work in ignorance, for the time being, without knowing when infection was had, or whether any was had. By introducing the poison and the antidote at the same time, this uncertainty is avoided. This is called the *simultaneous* treatment; whereas the use of the serum alone upon a naturally infected or sick hog is called the *single* treatment. For the purpose of the simultaneous treatment, it is desirable that the virus be virulent and the serum be as potent. The virus being administered upon a susceptible hog, he is sure to die, unless the serum be sufficiently potent to counteract the poison.

Neither the virus nor the serum is an artificial compound of ingredients. Each of them is simply the blood of a hog, defibrinated. That is to say, each of them is the serum of the blood, though the name "serum" is applied to only one. The virus is the blood of a cholera hog, and is taken from animals about to die from cholera. The serum is the blood of an *immune* hog. The processes for obtaining this latter are much more extensive than those for obtaining the virus. The immune hog may be rendered hyper-immune. The method of doing this is to inoculate the immune hog with very heavy doses of virus, and, after many days, if the hog continues well, to draw from him a quart or more of blood. In the record, this process is called *hypering*. The serum from the hyper-immunized hog is supposed to be more secure in its purity and potency than it would be if such process were not had. The serum thus obtained is complete. No medicinal ingredients are added to it. Before offering the same for sale, it is subjected to a test by experimentation. There is no known method of applying a test to the serum directly. Whether it is, in fact, potent in the particular case cannot be ascertained, chemically or microscopically. No constituent part has ever been discovered in it which is not found in the blood of any healthy hog. The theory is that this serum necessarily contains some organism termed "anti-body," which multiplies itself rapidly, and overcomes the virus. No such organism, however, has ever been found by any method of research. The term "anti-body" is a mere name for the conception. The only method of test, therefore, that is available, is to try the serum upon infected hogs and observe the results. The generally accepted test is known as the eight-pig test. A description of this test will appear in the testimony of some of the witnesses hereinafter quoted. Briefly stated, eight healthy pigs are selected, and are inoculated with the virus. Six of them are inoculated with the serum,

also, different quantities being used. The serum is not used upon the other two. They are called the "check" pigs. They are expected to die, as a result of infection. When the disease has about run its course, they are killed, and a post-mortem examination had, to determine whether they in fact had cholera. If the "check" pigs are found to have cholera and the other six pigs get well, the serum is deemed effective and ready for the market. If any of the six pigs die, the test is not satisfactory, and a subsequent test must be had before the serum can be put on sale. If a subsequent test proves successful, this is sufficient to justify the use of the serum. Under the law, a complete record must be made and kept of each test in all the details of its successive stages, and this record must be preserved and kept open at all times to the inspection of public officers.

The defendant's serum was produced in quantities of twenty gallons in one container. Each quantity so produced was identified by number, and known as a lot, or series, of which a complete record was kept. In July, 1914, the plaintiff and his assignor, Dr. Koon, received from the defendant company certain serum, and they used the same in the treatment of hogs. The mortality was very great. The plaintiff claims that, out of 52 hogs treated by him, 28 died. Similar results were had with other herds. A portion of the serum received by Dr. Koon was sent to the Agricultural College, and was there tested by Dr. Cole. The test applied was the eight-pig test, but was only approximately followed. Of the six hogs receiving serum, four died and two lived. Except as hereinafter indicated, it is undisputed that, before the serum was put upon the market by the defendant, it had been subjected to the eight-pig test, and a complete record of the test was preserved. The test was conducted in the generally accepted way, and was completely successful in result. Three days before the serum in question was received by the plaintiff, he had received

from the defendant a quantity of serum, and had used the
same with undoubted success. It is the claim of the plain-
tiff, however, that such serum came from another lot, or se-
ries; whereas it is the claim of the defendant that it was a
part of the same Lot No. 18, and this is indicated, also, by
the records of the defendant, which were kept by it in con-
formity to the law. The plaintiff, however, is undoubtedly
entitled to the benefit of his contention on any disputed
fact in the evidence.

II. The following excerpts from the testimony of
plaintiff's expert witnesses will be helpful to an understand-
ing of the decisive facts of the case. All the experts were
experienced veterinary surgeons. Dr. Rice testified:

"The method of producing hog serum: The first thing
we have got to have is an immune hog: that is, a hog that
has had the disease and recovered, or has been vaccinated
with the simultaneous method,—that is, you inject the virus
in one part of the body, and at least three or four inches
from that point, inject the serum,—that hog develops an
immunity. You could get your hog from either source.
Then you take susceptible shoats and inject them with virus,
and these pigs sicken usually about the seventh or eighth
day. That is the usual rule. You then stick these pigs,
and draw the blood of the sick pigs. That is known as the
virus. They then hold a post mortem on the pig to see that
he had cholera lesions and hasn't any other disease, like
tuberculosis or something of that nature. They take this
virus, break the clot, and strain it. They then take an im-
mune hog and weigh it, and then pump 5 c. c. per pound of
weight into the veins of the immune hog. That makes what
we call a hyper-immune hog. There are some people that
use 6 c. c. per pound weight, and I have known them to use
7; but as a general thing, they use 5. If they draw the
serum from the tail, they wait 10 days, and make the first
tail-bleeding. If they kill the hog outright, they usually

wait from 18 to 21 days.   After they draw this blood from
the hog, they defibrinate or break the clot and strain it and
add one half of one per cent of carbolic acid.   This was the
method of developing anti-hog-cholera serum.   The principle
that it is based upon is that, if an animal has a disease and
recovers, what makes him recover is that there are anti-
bodies in his own body.   In the case of hog cholera, they
seem to be in the blood.   The virus is gotten by taking the
blood from a hog known to have the cholera.   An animal
can be given the cholera by taking a hypodermic syringe and
injecting the virus into a susceptible hog.   A 'susceptible'
hog means healthy hogs.   If you would put him in a pen
where hogs had cholera, it would take cholera; or else, if
you injected him with blood from a hog, he would take it.   I
wouldn't say what amount of virus is necessary to give the
hog cholera.   The Dorset-Niles-McBride method was used
prior to July, 1914.   It was customary to use from 2 to 5
c. c. of virus to inoculate a hog.   The dose of virus is usu-
ally based upon the size of the hog.   Different manufacturers
recommend a different size dose.   There was a time when they
recommended ¼ c. c. of virus for a pig under 50 pounds,
but they raised that to ½ c. c.; and now, if the pig is from
an immune sow, they recommend ¾ of a c. c.   As I stated
before, 5 c. c. of virus per pound of live weight is used in pro-
ducing hyper-immunized hogs: that is, a hog which would
weigh one hundred pounds would have 500 c. c. of virus
pumped into him to produce the serum.   The production
of serum is practically the pumping into the hog of virus
which is allowed to remain for a certain length of time,
and then his blood is drawn off and defibrinated, and the
liquid taken from the blood is serum.   They draw off the
blood of hogs and defibrinate it and filter it, and that is what
is known as hog cholera serum.   *   *   *   Q.   Now, Doc-
tor, are there varying degrees of potency fixed by the va-
rious manufacturers of serum?   A.   The degree of potency

is not fixed, so far as anybody knows. That is what I referred to when I said there was nothing definite about the degree of potency.   *   *   *   The usual method of using virus and serum before July, 1914,—they simply caught the hog and disinfected it, poured the serum into a sterilized container, took a syringe that had been sterilized, drew the serum up into the syringe, and injected it into the hog. They injected the serum either into the axillary region, inside of one of the forearms, or into the flank. It is customary to put virus on the opposite side, or at least three inches from the point where the serum is injected. It is usually customary to follow the doses as recommended on the label, and was customary over the state at that time. So far as I know, that was the method of administering virus and serum during the year 1914. They test it to find out the potency of the serum. I have been in plants where they were testing serum, and I saw them put on the test. They would take a batch of serum and number it, either by letters or by figures. They draw a sample of the serum. Then they take eight healthy pigs, and they usually try to get the history of these pigs, if they can. They give two pigs 2 c. c. of virus. What I mean by 'history' is, they trace back to find out whether they have ever had hog cholera or been connected with hog cholera. They then take the temperature and weigh the pigs. There should be eight pigs. They should weigh not less than 45 pounds nor more than 90 pounds. Two of these pigs should get 2 c. c. of virus each; two pigs to have 2 c. c. of virus and 15 c. c. of serum each; two pigs to have 2 c. c. of virus and 20 c. c. of serum each; two pigs to have 2 c. c. of virus and 25 c. c. of serum each. They take the temperatures of these pigs each day. The pigs that got the virus only should sicken between the seventh and eighth day, show physical symptoms, and have a rise in temperature; and the other pigs, the 20 c. c. pigs and the 25 c. c. pigs, should stay apparently healthy; dur-

ing that time, they might have a rise of temperature and stay up a short while.  They sometimes do that in the reaction. If you take the temperature of a normal, healthy hog for 40 days, you will find that the temperature varies.  It will be between 100 and 103 degrees Fahrenheit.  A hog could be healthy and have a normal temperature at 104.8.  If you took 500 or 1,000 hogs, you would find that their normal temperature runs around 102 to 103.  104.8 is higher than normal.  You could take the temperature of a hog for 40 days, and sometimes the temperature might be up to 104.  A hog with 104.8 temperature would be a suspicious hog, unless you had the history of the hog.  These two pigs that got the virus only, my experience is that they would develop the disease known as hog cholera.  If they didn't, I would attribute it to your virus, or else your hogs were immune. If the hogs which had the serum don't develop any disease, and the hogs that had the virus, after being posted, show cholera lesions, I would think the serum was potent.  Q. Suppose that two of the hogs that took 15 c. c. of serum die and the other four would live; what would that be evidence of?  A.  I would not consider it potent serum.  They would allow that serum to be retested a second time.  I have known of a plant where they tested it three times.  That was in a government laboratory, where the government had supervision.  I have known the serum on the second test, when satisfactory, to be used.  They are permitted to sell it,—allow it to be sent out.  *  *  *  Q.  This test that is taken is not an infallible test, is it?  A.  It is not.  Q. There is no way that you can get an infallible test as to whether the serum is potent?  A.  So far as my knowledge, there is not.  Q.  Well, the test depends a lot on other things, don't it?  It depends on whether or not the veterinarian administers it correctly, administers the dose that is recommended,—that is one of the things it depends on?  A. Yes, sir.  It depends also on whether or not the instru-

ments are sanitary, or sterilized. The amount of the serum might depend in a small way on what the hog had been fed on. * * * The most virulent kind of hog cholera is septicemia. There is a very close relation between blood poisoning and different kinds of hog cholera, microscopically. Septicemia is more rapid than hog cholera. Sometimes the lesions are hard to distinguish between what is known as the very acute type of hog cholera and blood poisoning, without taking it through a regular laboratory method. If you take the blood from a sick hog and filter it through a filter and inject a susceptible hog with it, you can tell with reasonable certainty whether it is hog cholera or not. You can't tell for certain without finding lesion. There must be typical lesions of hog cholera. There are certain stages that it is hard to tell, on a post-mortem examination, whether it is hog cholera or septicemia. Q. Then there is no exact or definite way to know the effect, the exact potency of hog cholera serum either, is there? A. We have a fairly good test,—it isn't exact, but it is a fairly good test. It is the best method there has yet been devised, and this method I have outlined to you,—that is the Dorset-Niles-McBride method. So far as I know, prior to July 1, 1914, the Dorset-Niles-McBride method was the only legal test, and the only one that was recognized in the plants I have referred to."

Dr. Cole testified:

"Hogs which are treated with the immunizing process always show a reaction following the double vaccination,—not the single. When the virus is injected, there follows a period of incubation, in which there are no signs of disease in the hogs. You can inject the hog with virus today, and it will show no symptoms of disease for at least four or five days. That is called the period of incubation. When the symptoms do appear, or when they would appear with the serum not potent, that is called the reaction, and there

usually is some slight elevation of temperature. Sometimes the hog gets sick for a day or two, and gets back on feed and will be all right after the reaction, and a reaction of that kind indicates that they are close to the danger line. * * * All serums vary in strength, more or less. I refer to the strength of serum as potency, and I refer to the strength of virus as virulency. When we make serum, we use 80,000 cubic centimeters. That is 80 quarts, and that would be in one container. Different serial numbers are not always of the same potency. *I don't think it is possible to make them of the same potency.* I would not consider testing an experiment. *If I were to make a test, and one hog would die in the test and the other hogs would not die, I would say that the serum had potency. If it didn't have it, they would all die. In the test I made, I had one hog with a temperature of 104 to start with, and he lived. I certainly would say he was immunized after he recovered from the treatment.* * * * Q. Is it possible, under the circumstances that now exist, to make serum without having organisms in it? A. When the serum is fresh, *I will say that it is impossible to make serum without having organisms. I think, from a scientific standpoint, it might be possible to draw blood that is not contaminated; but it is not practical, by any means.* Q. It would not be practical to manufacture serum for the market and keep it perfectly pure? A. No; it would cost more than the hogs are worth to make it that way. * * * We have used every precaution to make our serum. The serum we have sent out in every instance is up to the standard required by the laboratory at Ames, and has been potent serum. We have sent out no serum from the laboratory at Ames that has not been potent. Q. Do you say that you have always succeeded in preventing hog cholera with it? A. No, sir. I will not say we have failed many times; we have had failures in different parts of the state; we have had a number of failures.

*Q. You would send out a bottle of serum from one series and that would fail and all the other parts of that series would be successful? A. We have had that happen,—yes, sir.* I do not account for the failures based upon the fact of the lack of potency of the serum. We couldn't always convince the farmer of that, but I was sure in my own mind. We have had suspicions, sometimes, that the instruments were not properly sterilized, and we have *had instances where we thought that the hogs were diseased. We have found cases where they were affected with pneumonia, with parasites.* * * * The only classification of hog cholera that I know of is acute and chronic,—perhaps sub-acute might be in there. There are cases of hog cholera where the lungs are but little affected. I will say that it is difficult to diagnose between septicemia and acute hog cholera; the lesions and symptoms are very similar in both. I don't mean to say that it is difficult before death, but it is difficult after death; what I mean to say is that the lesions are alike. * * * *Pneumonia is very common among hogs. Pneumonia is very commonly found in connection with hog cholera. I don't know whether it is caused by hog cholera.*"

Dr. Stange testified:

"The hog cholera agent or principle of virus is invisible with our present equipment. The virus is a filterable agent, which, according to our present knowledge, causes disease. Virus is the blood of a cholera hog; the defibrinated blood of a hog suffering from hog cholera. * * * Hog cholera serum, prior to July, 1914, was produced as follows: A hog that is resistant, or is commonly called immune to hog cholera, is inoculated with a large quantity of defibrinated blood taken from a hog suffering from hog cholera. This operation is ordinarily called 'hyper-immunization.' In response to this introduction of virus, the serum-producing animal, according to our present ideas, throws off a large quantity of protective bodies which overcome this virus. These pro-

tective bodies are found in the blood of hogs treated with this virus, and when this blood is drawn and defibrinated, and a small quantity of preservative added to it, it is known as hog cholera serum.   *   *   *   These bodies which I have referred to are known as anti-bodies.   *   *   *   The theory, as I understand it, is simply that you inject a hog with cholera virus, and that the serum introduced contains sufficient of the so-called anti-bodies to protect this hog until the hog itself can produce anti-bodies overcoming the virus. *   *   *   The agency of diseases of swine are micro-organisms.   I prefer to use the word 'cause,' instead of 'agency.' The ordinary bacteria are classified as vegetable.   I am not sure that I ever saw the bug that causes hog cholera.   The bug that causes hog cholera is ultra-microscopic, so far as established facts go.   *   *   *   The name is—we call it virus,—that is the only name for it.   I don't think there is any specific name.   I do not think it is all theory.   Q. Well, now, if you have never seen him, never heard him, never smelled him, never tasted him, how can you say that he is—   A. Just the same as we know there is electricity.   Q. Yes, by experiment?   A. Yes, by its action, by phenomena. We do not know what electricity is, and we do not know what this bug is.   I know there is a filterable agent.   Q. If I hand you a cubic centimeter of virus, can you tell me how many bugs there are in it that are agents or cause of hog cholera?   A.   No, we don't.   Nobody knows the number. Q.   If I hand you a cubic centimeter with pneumococcus germs in it,—that agency that produces pneumonia,—you can tell me, can you not, how many germs there are in it, if you take a heavy magnifying glass?   A.   Approximately. Q.   And if I hand you a cubic centimeter of fluid, or virus, the only way you can tell what is in it is by experimentation, isn't it?   A.   By animal inoculation.   *   *   *   We are not sure that the agency or cause of hog cholera has ever been seen or identified or labeled by anybody.   We are

not sure of the relation between this new body and the virus. I could not tell the court whether the cause or agency or fluid causing hog cholera is a vegetable: I have never seen it. Q. If I take a cubic centimeter out of one series of virus, and a cubic centimeter out of another series of virus, can you say, by any microscopical examination that can be made, that there are the same number of bugs in these two cubic centimeters of virus? A. No, sir. We can only say that the two cubic centimeters of virus are the same by animal inoculation. Q. Only by experiment and by testing it upon some animal? A. Yes, sir. Q. Now, that is the only way that you can tell, isn't it? A. Yes, sir. We cannot take an immune hog and look at it with our eyes and tell whether it is immune or not. We cannot take a hog and tell whether it is susceptible or not until we inoculate him. Before we can tell whether a hog is susceptible or not, that must be done by a test, by inoculation. Q. With all of the experience that you have had,—which is great, as I understand, —you cannot tell whether a pig is susceptible to this virus until after you have made your inoculation, can you? A. No, sir. Q. As I understand you, the only means in the world that you know anything about is this test,—to test it by inoculation? A. At the present time, that is true. That would be true in 1914. *, * * Q. Then whatever knowledge you have, Doctor, it comes from experiment, don't it,—from testing it on animals, on animal life? A. That is the way we get practically all of our information. In a cubic centimeter of serum, I could not tell you how many anti-bodies you would find. We have no way of measuring those, at the present time. The only way we can tell the strength is by testing it on hogs. Q. In vaccinating your checked pigs, or shooting into them virus, haven't you known, in your broad experience, instances of where one of them lived and the other died? A. Yes, sir. Q. You have known where one of the checked pigs died and one

got well, and some of the hogs that received virus and serum both died, and some got well, haven't you? A. I have known tests of that kind,—yes, sir. Q. So that the only way that you can tell exactly what the serum is going to do is to test it, isn't it? A. Yes, sir. Q. The only way that you can know what the serum and virus together is going to do is to test it, isn't it? A. It is all supposed to be tested. We recommend that all hogs that are apparently healthy receive serum and virus both. Those that are sick receive serum alone. * * * We do not recommend any kind of vaccination unless it is necessary,—I mean, unless they are threatened with cholera. There are some risks in vaccination. Hogs have idiosyncrasies; they are more susceptible to disease than any other animals. I am not sure that I can name all of the diseases of hogs. The normal temperature of a hog varies from $100\frac{1}{2}$ to $102\frac{1}{2}$. If a hog showed 104 in a test and there were no other symptoms, I would go on with the test. * * * When the reaction comes, there is no definite temperature that can be said to be characteristic. It will vary from 106 to 107. There are a great many things about hog inoculation that are very indefinite. After an inoculation by the simultaneous method, if the hog's temperature does not rise about 103 to 104, I could not say whether there had been any reaction. I could not pass judgment on a serum test unless I know the amount of serum used in the test. The amount of the virus used in the test does have something to do with it, within certain limits. Q. Well, assuming now that the pigs had 2 c. c. of virus, the checked pigs, and the pigs weighed about 50 pounds, and the other six had 20 c. c., and one of the checked pigs died and the other didn't, —it manifested no trouble,—and the temperature of the other six pigs did not rise above 103 to 104, what would you say about the test? A. I would say it was uncertain. There are many reasons. In the first place, the pigs might

not all have been taken from the same lot. *One might have had exposure immediately prior to being put in the test. When I say 'exposure,' I mean exposed to hog cholera.* The virus used in testing might not be virulent. \* \* \* Q. So there is not any infallible method that you can arrive at the very results that you desire, is there? A. The test is the most accurate thing we have. My idea of a satisfactory test of hog cholera serum: Take uninfected, susceptible pigs; inject those with virus, 2 c. c., which will produce symptoms of cholera in a susceptible hog of the same weight inside of eight days, and the death of those hogs within fourteen days. Other susceptible pigs of the same weight should receive the same amount of virus taken from the same source, and in addition, an amount of serum graduated according to the weight of the animal. The hogs should weigh from 40 to 90 pounds,—that is, between those limits,—and those pigs should receive 15 c. c. of serum, 20 c. c., and 25 c. c. This would be the eight-pig test, so-called. A larger number would be preferable. The method that was recognized in 1914 was the eight-pig test. None of the hogs receiving the serum should die, and none of them should show physical symptoms of hog cholera. They might show a rise of temperature,—105 or 106, depending on conditions. A person would have to use his judgment as regards the temperature, but there should be no physical signs of hog cholera in the hogs receiving the serum. If none of the hogs having the serum showed a rise of temperature, I would regard the test as questionable. The temperature does cut some figure. If none of the hogs show any temperature in reaction, it cuts some figure. In a great many tests, we find hogs that run along with practically normal temperatures. In others, it runs rather high. The temperature is not the most accurate indication, and should never be regarded except in connection with clinical symptoms. Q. That is, when you say it should never be re-

garded, you are giving your opinion? A. Yes, that is all. I give. All these factors must be considered, in order to pass judgment on the test. If the pig receiving the 25 c. c. of serum dies, I think the serum should be retested. If the two virus pigs die, and the pigs receiving the serum and virus show no physical symptoms, I would regard the test as satisfactory. * * * With reference to the rise of temperature, to our observation, the earlier the serum can be given, the more effective it is, and as a matter of fact, after the hogs begin to show physical symptoms of the disease, it is questionable as to how much good the serum does. If the serum is given within a reasonable time after the rise begins, I would say the effect to counteract the disease would be uncertain. The serum should be given early in the rise of the temperature, at the beginning of the rise of temperature. My observation is that, if the virus is given when there is shown no rise in temperature, that in many cases it may check the disease. It depends on the length of time between the infection and the time the serum is given. My opinion is, if the infection had taken place not over two days before the treatment with serum, and serum was given in sufficient quantities and properly administered, in a very large per cent of cases you might save the hogs."

The plaintiff, Hollingsworth, who is a veterinary surgeon, testified:

"Q. So that this serum that you injected in the hogs has no effect whatever on what is known as swine plague? A. No, sir. If a hog had swine plague at the time that I injected this serum into the hog, I would expect the serum to have no effect whatever on swine plague. Q. Now, Doctor, does it make any difference, in vaccination and treatment of hogs after vaccination with the simultaneous method, as to what they are fed on? A. No, sir. Q. Perfectly clear about that? A. Yes, sir. * * * Q. Now, I understood you to say, when you were examined by Mr.

Kimball, that serum was not all of the same potency or strength,—that it varied. That is right, isn't it, Doctor? A. Yes, sir. I know this because of my experience, my long experience in these matters. And I know that serum is not all of the same potentiality. The potentiality of serum has nothing to do with the amount of virus used. The virus should always be of the same virulence, but it is not so. There is no kind of animal that has more idiosyncrasies and peculiarities than the hog. The only way that you can definitely determine the real condition of a hog is by post mortem. Our science recognizes that fact. It takes 5 or 6 days after inoculating a hog with cholera to have any visible symptoms of cholera. No veterinarian, however skillful, if a hog was inoculated with the agency of hog cholera today, could tell on tomorrow that the hog was so inoculated. And this might be true for 8 days,—as long as 8 days after inoculation. There is a varying situation. Some hogs are so eccentric that you might get the rise of temperature within 3 days, and some hogs are so eccentric and have such idiosyncrasies that you could not get a rise of temperature until 8 days. You couldn't tell that the hog was inoculated until the temperature manifests itself. Not so much if the hog was on feed and appeared healthy. The hog will stay on feed after there is a rise in temperature. The fact that they stay on feed don't help us any to detect latent cholera. Q. I bring you a hog, now; its temperature is normal, everything is normal about it that you can see from the outside; yet the day before it took into its system the principle that produces hog cholera— A. Yes, sir. Q. Can you tell it? A. No, sir. It requires from 3 to 9 days to discover symptoms of hog cholera after inoculation. You could not detect hog cholera the next day after the hog had been inoculated. You might put serum into a hog infected with hog cholera, and the operator not know it. You could not discover it by post-

mortem examination made 2 or 3 days after inoculation. You could not tell anything about it until the symptoms became marked. Q. So that a hog might be inoculated with pneumonia, with the germ or agent of pneumonia, when you vaccinated it? A. Yes, sir."

III. The foregoing is perhaps a sufficient setting forth of the expert facts to enable us to go to the decisive questions of the case. The charge of negligence against the defendant, as made in the final substituted petition, is as follows:

"That the defendants did negligently and wrongfully make, produce, distribute, and put upon the market, and did offer for sale, keep for sale and sell the said hog cholera virus and an impotent serum in connection therewith, so that the same was put upon the market and obtained by various persons for use for said purpose of immunizing hogs; that the defendants did wrongfully, unlawfully, and negligently sell said hog cholera virus and said hog cholera serum, contrary to the laws made and provided by the state of Iowa; that the serum so sold by the defendants was impotent and impure; and that the same was not of the potency as required by law in the state of Iowa; and that same was below the standard of potency required by law, and below the standard potency established by the authorities of the state of Iowa."

There is considerable dispute in the argument as to whether the sales in question were made in Iowa or in Nebraska, and whether the rights of the parties are to be determined under the Federal statutes or under the Iowa law. It appears that there is a small part of the state of Iowa situated upon the west bank of the Missouri River, and practically included in the city of Omaha. The plant of the defendants was located within the Iowa boundary. All goods, however, were necessarily shipped to Omaha, in order to get into the state of Iowa proper. The defendant com-

pany had both a Federal license and an Iowa license. The conclusion we reach renders it unnecessary for us to consider the question of whether the sale was made in Iowa, and if so, whether the shipment was, nevertheless, an interstate shipment, or whether the rights of the parties are governed by the Federal or the Iowa statute. The plaintiff contends that the sale of the serum was in violation of Chapter 227 of the Acts of the Thirty-fifth General Assembly (Section 2538-w *et seq.,* Code Supplement, 1913). Sections 4 and 8 of such chapter are as follows:

"The director of said laboratory shall have the power and it is made his duty to *establish and declare the standard degree of potency of hog cholera serum for successfully treating,* curbing and controlling hog cholera or swine plague.  *  *  *  At the time of issuing said permit, the said director shall deliver to said applicant a statement showing the standard or degree of potency of hog cholera serum as established by said director and said permit may at any time be revoked and canceled by said director when it becomes evident to him that the terms on which it was issued are being violated. No hog cholera serum shall be sold or offered or kept for sale or use, or be used in this state which is *below the standard test of potency established by the director*, except for experimental purposes at the place of manufacture of hog cholera serum and under the direction of the manager thereof."

"After the taking effect of this act, any person, firm, company or corporation offering or keeping for sale in this state any hog cholera serum or virus without securing a permit from the director, or selling or offering or keeping for sale after said permit has been canceled or has expired, any hog cholera serum, or while holding a permit, selling or offering or keeping for sale any hog cholera serum which is below the standard of potency as established and declared by said director, shall be fined in a sum not less than

one hundred dollars or more than five hundred dollars."

In the purported exercise of the authority conferred upon him by such statute, the director of the biological laboratory established and announced the following alleged standard of potency:

"The dose, which shall be stated on the label, *must be sufficient* to prevent a susceptible hog of the weight the dose is recommended for, from showing symptoms of hog cholera when injected hypodermically with two cubic centimeters of virulent blood which will produce hog cholera in susceptible hogs of the same weight within eight days after being inoculated with the same quantity of virulent blood."

The Federal statute on the subject is as follows:

"It shall be unlawful for any person, firm or corporation to prepare, sell, barter, or exchange  *  *  *  or to ship or deliver for shipment from one state  *  *  *  to any other state  *  *  *  any worthless, contaminated, dangerous, or harmful virus, serum  *  *  *  intended for use in the treatment of domestic animals, and no person, firm or corporation shall prepare, sell, barter, exchange, or ship as aforesaid any virus, serum, toxin, or analogous product manufactured within the United States and intended for use in the treatment of domestic animals, unless and until said virus, serum,  *  *  *  shall have been prepared under and in compliance with regulations prescribed by the secretary of agriculture at an establishment holding an unsuspended and unrevoked license issued by the secretary of agriculture.  *  *  *  The secretary of agriculture  *  *  *  is authorized  *  *  *  to issue  *  *  *  licenses for the maintenance of establishments for the preparation of viruses, serum,  *  *  *  in the treatment of domestic animals intended for sale, barter, exchange, or shipment as aforesaid."  U. S. Comp. Stat. 1916, Section 8785.

The regulations prescribed by the secretary of agriculture, under the authority of said Federal statute, adopted,

in substance, the eight-pig test which has been above described. As to the result of the test, the following criterion is declared:

"One or both of the check pigs must become visibly sick within seven days, and should be ready to die within fifteen days. If all of the serum pigs remain well, the serum may be recommended for use in a dose of 20 c. c. for hogs weighing 100 lbs. or less. If the 15 c. c. pigs become sick, while the others remain well, a dose of not less than 30 c. c. should be recommended for hogs weighing 100 lbs. or less. If the hogs receiving 20 or 25 c. c. of serum become sick, the serum must not be marketed *unless subjected to a subsequent test in the same way, which results in showing that the serum does protect in 20 or 25 c. c. doses,* or unless the serum be mixed with other and more potent serum, thus increasing its potency as shown by test after mixing. If the check pigs do not respond as indicated above, *the test must be repeated.*"

In support of the claim of negligence, the emphasis of plaintiff's argument is that the defendant violated the Iowa statute above quoted, and was, therefore, necessarily negligent. It will be noted from such statute above quoted that the legislature purported to confer upon the director of the laboratory the authority and duty "to establish and declare the standard degree of potency of hog cholera serum for successfully treating," etc. Section 8 of the act (Section 2538-w7) makes it a misdemeanor to put serum upon the market "which is below the standard of potency as established and declared by such director." Has such director ever established or declared the standard degree of potency thus called for? The only alleged standard ever declared is that which we have above quoted, which states, in effect, that the dose stated on the label must be *sufficient* to prevent a susceptible hog of the weight that dose is recommended for, from showing symptoms of hog cholera. Is

this alleged standard responsive to the statute? Does it establish a standard *degree of potency?* Does it set forth any rule or standard which will serve as a guide to and a requirement of the producer of serum before he markets his product? Or does it fail to specify a standard? Does it simply call for *results,* and does it require the producer of serum to become a warrantor of such results? If this provision can be fairly read as requiring a *fair test* of a serum to be made in *advance* of marketing, and requiring that *such test* shall show the result here called for, it might be deemed sufficiently responsive to the statute. We doubt whether it can be so read; and if it could, it would avail nothing to the plaintiff in that form. There is no ground in the record to claim that this lot had not been tested, and that it had not fulfilled the conditions of the test before marketing. If we are to read this declaration as a call upon the serum for *successful results after* it is marketed, it is not responsive to the statute. It is a purported exercise of authority not conferred upon the director. The language of the statute itself, in calling for a "standard degree of potency," is somewhat unfortunate, in the light of the expert evidence that there is no standard degree known, and that, therefore, none is possible. In responding to powers of regulation conferred by the Federal statute, in somewhat different terms than we have herein, the secretary of agriculture declared the eight-pig test as a standard or criterion of potency. If the director of the laboratory had responded in a similar manner to the Iowa statute, by prescribing some definite test which should be conformed to by the producer before he should market his serum, it would doubtless have been fairly responsive to the statute, and perhaps the only compliance therewith possible. We are satisfied, however, that no power is conferred upon the director to declare that ultimate results in the use of the serum shall be conclusive upon the producer, or render him subject to prosecution, notwith-

standing that the serum met the legal test at and before its marketing. The statute does not make the producer a warrantor of results, nor does it authorize the director to make him such. This view is emphasized by the further consideration that the serum, when completed, is subject to rapid deterioration, and has need to be kept with great care, under seal and refrigeration. We are of the opinion, therefore, that the declaration of the director was not responsive to the statute and was not warranted thereby. The criterion which the director is authorized to declare must be applied as of the time at or before the marketing of the serum, and not after marketing. The result of this holding is that there was no violation of the Iowa statute.

IV. Independent of the question of violation of the statute, was there other sufficient evidence in the case to warrant its submission to the jury? The burden was on the plaintiff, of course, both to show negligence and to show that such negligence was the proximate cause of the alleged losses. The plaintiff lays great stress upon the large percentage of loss in the herds of the plaintiff and his assignors, and this is the outstanding fact in the case. The trial court properly instructed that proof of the death of the hogs was not of itself proof that it was caused by any wrongdoing of the defendant. The proof contended for by the plaintiff is wholly circumstantial. In his brief, the plaintiff has specified as follows the circumstances relied on other than the losses sued for, as constituting the circumstantial evidence:

2. NEGLIGENCE: acts constituting: manufacture of hog cholera serum: evidence.

"1. The location of the plant was bad, and its nearness to the fly-hatching garbage plant made it impossible to produce pure serum, and the contamination of the serum weakened its potency.

"2. The virus was obtained from unknown hogs,

picked up on the market at the stockyards, and killed at Cudahy's packing plant.

"3.    The method of taking the virus at the packing house and carrying it to the plant in Council Bluffs was dangerous and unscientific.

"4.    The proper hogs, fed and cared for in the proper manner, were not used for hypering.

"5.    The defendants evidently knew something was wrong with the Series 18, and were negligent in selling it, because it was sent only into Iowa, and they were very careful not to ship it into Nebraska.

"6.    The admission of Dr. Juckniess that this serum was bad, at the time when there was a threatened prosecution by the director of the Iowa biological laboratory at Des Moines, was evidence of the defendant's negligence.

"7.    The failure to properly collect Series 18 from a given number of known hypered hogs, and the gathering of this serum from January to June in 1914, was contrary to the general rule of manufacture.

"8.    There was inefficiency of labor and lack of skill employed by the defendants to produce this important commodity.

"9.    The testimony of Dr. Alcorn of the use of the serum on eight herds of hogs in which the serum itself proved impotent.

"10.    The scientific test of the serum by the biological laboratory at Ames, which was in no way interested in the outcome of the result."

Of the foregoing specifications, Nos. 1, 3, 4, 5, 6, 7, and 8 have no support in the evidence.  As to No. 2, the action is not predicated upon any complaint of the virus furnished. Furthermore, the testimony of the expert witnesses is undisputed that, up to July, 1914, it was the usual custom to use hogs naturally infected with cholera as a source of the virus. A post-mortem examination was had in every case to de-

termine whether cholera was present, and whether there was any other contamination. If any other contamination or disease were found, the blood of such specimen was not used. The appearance of the foot and mouth disease caused the later abandonment of this practice.

Referring to Specification 9, Dr. Alcorn was a veterinary surgeon of Adair, who had used the serum of the defendant in June, 1914, upon nine herds as follows:

Herd No. 1, 70 hogs, all died. Herd No. 2, 30 hogs, 2 died. Herd No. 3, 81 hogs, none died. Herd No. 4, 75 hogs, none died. Herd No. 5, 14 hogs, none died. Herd No. 6, 57 hogs, nearly all died. Herd No. 7, 120 hogs, 2 died. Herd No. 8, 17 hogs, 2 died. Herd No. 9, 129 hogs, 44 died.,

The expert evidence which we have above set forth shows why, with the same treatment and the same serum, one herd could die and another could get well. There are several reasons which could account for the deaths. The cholera infection may have taken place, in fact, before treatment was had. Other diseases may have been present in the herd, upon which the serum could have no effect. The expert evidence on behalf of the plaintiff shows that pneumonia and septicemia and worm diseases are very often present with cholera. On the other hand, all these hogs save one herd were inoculated with virus which would have been concededly fatal to all of them if it had not been neutralized by the serum. The fact that so many of these hogs were thus artificially infected with the virus is of itself very suggestive evidence of the potency of the serum to withstand such virus. The fact that, out of herd No. 7, 118 out of 120 were saved, presented, of itself, a more severe and successful test than the recognized eight-pig test. We think the experience of Dr. Alcorn with these herds could not fairly be regarded as a circumstance tending to show negligence on the part of the defendant company. Its ten-

dency was the very reverse. Referring to the tenth specification, Dr. Cole, of the Agricultural College, made a test of the serum which he obtained in September, as hereinbefore indicated. He conceded that his test was defective, and would not have received the approval of the Federal government. As to one of the pigs tested, he gave a smaller dose than that called for by the label. As to all the pigs used, he omitted to take their temperature at the beginning of the test. Their temperature was taken on the second day—when it could not yet have been affected by the inoculation. The temperature of every hog used was above normal. The temperature of these pigs ranged, at that time, from 104 to 104.8. Concededly, the temperature was suspicious, though not necessarily decisive. Even if such test had been made strictly according to rule, the failure did not affirmatively condemn the serum. Under the Federal regulations, the rule is that, upon the failure of a test, subsequent tests may be made; and if a subsequent test is successful, it is deemed sufficient, notwithstanding previous failures. In such case, the previous failure is attributed to other causes than the serum. On this theory, the fact that a herd of 118 should be saved, like herd No. 7, in Dr. Alcorn's experience, is evidence that the loss of herd No. 1, of 70 pigs, was attributable to other causes. Under the rule of the eight-pig test, as recognized by all the experts, a failure of the test proves nothing affirmatively. It forbids the marketing of the product, however, until the conditions are met by a subsequent test. It is further to be noted that some of these herds, including some of the herds of plaintiff's assignors, were in close proximity to cholera-infected herds on neighboring farms.

We think, therefore, that the circumstances which we have here considered fall far short of sustaining a verdict either finding negligence of the defendant or that the al-

leged negligence was the proximate cause of the losses complained of.

The plaintiff introduced certain testimony in the nature of admissions on the part of the defendant Juckniess. The plaintiff, on direct examination, testified as follows:

"He said that I should not be losing so many pigs, and they should not be getting sick so fast; that he had not tested this serum *for some time*, and he wanted me to watch them every day, and if they continued on getting sick and continued on dying, he wanted to give me more serum to revaccinate with."

Later, on redirect examination, he testified to the same circumstance, as follows:

"Well, he says, we have *not tested that*, and it may be that you are going to have some bad luck. Now I would advise you to come down here every day and watch these pigs, watch them close, and in case more of them die, or they keep getting sick, you let me know, and I will come over and bring serum and revaccinate them. Q. Well, did you tell this right the first time or the last time? A. I told it right both times."

It is contended that this alleged admission was proof that the serum had not been tested. The evidence was permitted to stand against the defendant Juckniess alone. The witness did not purport to testify to different statements made by Juckniess, but he testified twice to the same statement, and did so contradictorily. As first testified to, the statement of Juckniess was not an admission that there had been no test, but clearly implied that there had been one. The statement as testified to the second time was an admission that there had been no test. In view, however, of the witness' testimony, when confronted with the variation of his testimony, that he had "told it right both times," we do not think he is in a position to claim anything from his contradiction of himself. The one statement is a con-

tradiction of the other, and the only explanation offered is that both are right. They could both be right only in the sense that the *first statement included the last*. The plaintiff, as a witness, testified also to the fact that certain abscesses had formed on some of his own pigs after the inoculation. It appears from his testimony, also, that, at the same time that he inoculated the pigs, he castrated the males, and that many of the abscesses complained of were scrotal. It also appears that the pigs inoculated were April pigs, which had been twice inoculated with serum previously. The theory put forward is that the abscesses indicated impurity either in the serum or virus or both. The testimony of plaintiff's own experts is that absolute purity of serum or virus is practically impossible. To attain it would incur prohibitive expense. Furthermore, Dr. Cole, in his test, found no abscesses. There is no claim that the impurity caused the loss of the hogs, but that it indicated a defective serum; but this theory is not supported by the plaintiff's own expert testimony. The plaintiff administered the serum to his pigs on July 14th. He testified that, by the night of July 28th, sixteen had died. He was confronted with a letter written by himself on the night of July 28th, wherein he reported *five* dead. His explanation of the contradiction was that he wrote the letter with a view of deceiving Juckniess. This testimony, such as it is, furnishes something of an illustration of the easy door which would be open for the recoupment of cholera losses if the liability of a producer of serum could be predicated upon the mere fact that the serum failed to save. The business is well hedged about by the safeguards of government, both state and national. Adventurers cannot engage in it. Only men of competent experience can obtain license therefor. The plants are subject to continual official inspection. The power of governmental departments over them is practically unlimited. It is greatly to the in-

terest of the public that effort and experimentation go on. A great degree of success has been attained. Continual discovery is being made. Even though the remedies have only partial success, they are well worth while.

The conclusion arrived at renders it unnecessary for us to pass on many legal questions which are ably argued in the briefs. The case presented occupies quite a new field. It is not a case of mistake in compounding medicine, nor of mistake in delivering a dangerous article in lieu of a harmless one, nor does it involve bad faith or fraud in putting the article into the channels of sale. Both purchaser and seller knew that, in the use of the article, uncertainty of result, to some degree, was inevitable. It was the duty of the producer to follow the approved methods of production and of testing, as generally recognized by those versed in the subject. Under the undisputed testimony, he could do no more, for general use. If further testing were deemed desirable for added security as to a particular herd, the purchaser had the opportunity to make it upon a few of the particular herd which he was about to inoculate. Before inoculating a herd of 210 pigs, as was done in one case, it might have been more prudent to have first selected eight pigs and experimented thereon. The prudence, if any, of such a course must have been as obvious to one veterinary surgeon as to another. What we hold, therefore, is: That the burden was upon the plaintiff to show that, in the production and testing of the serum, the defendant violated some duty owing to the public or to the vendees of the product; that no "standard degree of potency" of serum has been established in this state; that the published regulation of the director of the laboratory, calling for a dose sufficient to achieve successful results, if intended to refer to results attained after marketing, is not responsive to the statute, and was, therefore, not obligatory; that, if such published regulation may be read as a criterion for a test to be had be-

fore marketing, then it avails plaintiff nothing, because it does not appear that such prior test was not had; that, in either event, no violation of the statute was shown; that the circumstantial evidence relied upon is not sufficient to sustain a finding that the defendant violated the spirit of the statute, or that he failed to fully conform to the generally accepted methods of production and test.

Briefly stated, the finding of negligence is not sustained by the evidence. We have no occasion, therefore, to consider the question of proximate cause, nor whether something more than negligence must be proved in order to entitle recovery by subvendees. For the reasons indicated, the judgment below must be—*Reversed.*

Gaynor, C. J., Ladd and Salinger, JJ., concur.