R. F. BROWN, et al. (Plaintiffs), Respondents, v. H. K. MULFORD COMPANY, a Corporation (Defendant), Appellant.

Springfield Court of Appeals, December 20, 1917.

1. **DRUGGISTS: Negligence: Hog Cholera Serum: Liability.** Where defendant, a manufacturing chemist, sold to a veterinary hog cholera virus and serum for use on hogs, and he used it on plaintiff's hogs, which were thereby killed, the defendant was not an insurer of the remedy even if administered according to directions, especially where it specifically warned of the dangerous character of the substance.

2. ———: ———: ———: **Evidence.** Evidence *held* to show that the manufacturer of hog cholera serum and virus was not negligent in failing to divulge to the purchaser the dangerous and poisonous character of the remedy.

3. ———: ———: ———. The mere fact that hogs died from the use of hog cholera virus and serum in the way it was intended to be used does not establish negligence in its manufacture.

4. **NEGLIGENCE: Burden of Proof: Proximate Cause: Other Causes. Equally Probable.** The burden of showing a causal connection between the negligence and the injury is on plaintiff, and where the injury may have resulted from another equally probable cause and the uncertainty so inheres in the evidence as a whole, when received in the light most favorable to plaintiff after resolving all conflicts in his favor, that it is mere speculation to attribute the injury to the cause tainted with negligence, the plaintiff cannot recover.

5. **DRUGGISTS: Liability for Articles Manufactured and Sold.** A manufacturer or dealer is liable for injury to third persons using articles manufactured or sold by them only when sold as being safe and harmless and negligence is shown in the preparation or directions for using same.

Appeal from Christian County Circuit Court.—*Hon. Fred Stewart,* Judge.

REVERSED.

*Barrett & Moore* for appellant.

*F. T. Stockard* and *Hamlin, Collins & Hamlin* for respondent.

STURGIS, P. J.—The plaintiff, a farmer and stock raiser, sued and recovered judgment against the defendant, a manufacturing chemist, for causing the death of forty-nine of his hogs. The defendant is located at Philadelphia with branches or distributing offices at St. Louis, Kansas City and other large centers. It manufactures a large variety of chemical products and among them a remedy for hog cholera designated as the "Serum-Virus (Simultaneous or Double) Treatment." The defendant does a wholesale business only and sells this product to the Drug and Veterinary trade. The plaintiff claims that his hogs were killed by having this remedy administered to them. The medicine was sold to and administered by Dr. Winters, a local veterinary, though not licensed as such. The sale was made to Dr. Winters by a traveling salesman who took his order therefor and forwarded same to defendant.

It is alleged and admitted that defendant recommended this medicine as a remedy, or preventive rather, of hog cholera and prescribed the dosage and manner of administering same. The recommendation and prescription for its use is a general one being printed on the label of the bottles containing same and in circulars sent out with each bottle. The petition alleges that this hog cholera remedy was sold to Dr. Winters for use on the particular hogs of plaintiff with directions prescribed for administering it to such hogs, but the only evidence on this point is that Dr. Winters was practicing his profession, including that of vaccinating hogs for the cholera in that neighborhood, to the knowledge of the traveling salesman who took the order and that such traveling salesman knew of plaintiff's hogs and recommended to him the use of this remedy. Hog cholera was then prevalent in that neighborhood. It is not claimed that any such information accompanied the order and defendant received

and filled the order in the general way of goods sold to a local dealer. Dr. Winters testified that he had no connection whatever with the defendant company; that he ordered this medicine to use in vaccinating plaintiff's or any hogs in his field of practice; that he sent in a number of orders for this remedy during the year from time to time, some of which were filled at the Philadelphia office and some at the Kansas City office; that he thinks he vaccinated as many as six thousand hogs that season. All the directions he had for using this medicine were the general directions accompanying each bottle. The plaintiff admits that he employed and paid Dr. Winters to administer this remedy to his hogs, Dr. Winters furnishing the medicine, though the defendant's traveling man was present, recommended the medicine and heard plaintiff talking over the terms, etc. This salesman was merely the general salesman of defendant's products of which the serum was one and was merely calling on the trade and taking orders for this and hundreds of other products sold by defendant.

The plaintiff also alleges in his petition that the said hog cholera remedy used in the manner prescribed by Dr. Winters was a deadly poison and was so known to the defendant; that defendant knew that said remedy or serum would, if administered as per directions furnished by defendant, poison and kill hogs instead of curing and preventing the disease of cholera, which fact of the highly dangerous and poisonous character of the serum the defendant negligently failed to divulge or make known to Dr. Winters or to plaintiff. The proof falls far short of sustaining this allegation. The only proof of the remedy being a deadly poison is that Dr. Winters administered the same to these hogs and in eight days thereafter they became sick and began dying and at the end of two or three months forty-nine of the fifty-nine treated were dead. Both plaintiff and Dr. Winters say that at the time of the treatment the hogs were apparently well and showed no symptoms of cholera. The hogs of a neighbor were

treated by Dr. Winters about the same time and a large per cent of them also died. It was shown, however, that hog cholera was raging in that neighborhood—that doubtless being the reason for these hogs being treated—and that other herds of hogs treated in the neighborhood fared well and showed a small death rate. It is conceded that hog cholera is highly infectious, spreading from farm to farm, the germs beings carried by dogs, birds and animals and even persons walking from an infected district may carry same on their feet. As to defendant not disclosing to Dr. Winters the dangerous character of this remedy, we may say that such is disclosed on the labels of the bottles and the directions for using same; and besides this Dr. Winters as a veterinary and holding himself out as competent to use this remedy in treating this disease must be held to have known the natural and probable results. Dr. Winters as a witness for plaintiff does not claim any ignorance or lack of information in this respect.

It should be explained, as we learn from the evidence, that this hog cholera remedy is considerably like vaccination for the prevention of smallpox. The simultaneous or double treatment consists of making two injections of different kinds of serum into the flesh of the hog at or about the same time. The one is a poison, the other an antidote. Both of these are taken from the blood of hogs, the one from a hog that has the cholera and the other from a hog that has had it and recovered—an immune hog. The only manufacturing about it is to condense and properly preserve this blood for use. The blood or virus from the cholera infected hog contains the cholera germs and is disease producing. The purpose of injecting this is to give the hog the cholera and unless something is done to cure it or counteract the effects death will likely follow. The bottle containing this ingredient has on its label: "Hog Cholera Virus (Virulent Blood). Handle Carefully. Caution: Burn empty packages and unused virus." After giving the dosage of various sized hogs

this follows: "This product should be used only by qualified veterinarians. We guarantee that this product is carefully prepared, but we assume no responsibility for results following its use. The pigs from which this virus or virulent blood was obtained showed lesions of acute hog cholera only at post mortem. Virus should not be injected into hogs without full standard doses of Hog Cholera Serum Mulford, i. e., 20 c. c. for every fifty pounds of hog. If used without serum or with insufficient serum, it will produce hog cholera.

Hog Cholera Virus should only be administered in strict accordance with our printed instructions. Under no circumstances do we accept any responsibility, expressed or implied, as to the results of its use or sale. If the purchaser does not accept Hog Cholera Virus on the above terms it should be returned to us within five days." The serum which is given as part of the treatment is to cure or counteract the cholera virus. It is taken from the blood of hogs that have had the cholera and have become immune or hyperimmune from being infected a second or third time. This serum to be effective as an antidote must be injected before the hog has had time to become thoroughly infected with the virus and in practice is injected at the same time as the virus. The dosage of this is also given on the label and in the instructions for using this treatment we find: "Hog Cholera Virus Mulford should never be injected into hogs without the full standard dose of Hog Cholera Serum Mulford—i. e., 20 c. c. for every fifty pounds of hog. If used without serum, or with insufficient or weak serum, it will produce hog cholera. . . . It is only with the greatest care and best judgment on the part of skilled and qualified veterinarians that the Serum Virus or simultaneous treatment may be safely used. . . . If the dose of serum is too small in proportion to the dose of virus, or serum weak in potency is used, or the animals are unusually susceptible, hog cholera may ensue and a new center of infection be started. This disadvantage of the Serum-Virus method must be con-

sidered seriously. . . . Note—We guarantee Hog Cholera Serum Mulford and Hog Cholera Virus Mulford to be accurately prepared and carefully tested in accordance with approved scientific methods. We assume no responsibility for unfavorable results following its administration.''

Dr. Winters, testifying for plaintiff, says that in giving this treatment on plaintiff's hogs he followed the directions as to dosage and manner of injecting given by the defendant; that he does not know what caused the hogs to die; that other hogs vaccinated by him did well, the loss being practically nothing; that he don't remember how much he gave these hogs, only that he followed the directions on the bottle. Further testifying on cross-examination he said: ''I read the notice on the box and on the bottle. I had full knowledge of the character and the results of the medicine that anyone would likely have, I knew that the notices told me that it would give the hogs the cholera. I knew that before I read it. Mr. Brown (plaintiff) was told the same thing before I gave the treatment to his hogs. He was told it would give his hogs the cholera. The prescription given with this medicine, judging from my experience and everything considered, is the proper prescription for a treatment of this kind. It is indeed. The way it is prescribed is the proper way to give it. It was properly described. This is the most approved and best medicine in treating hogs for the cholera and for the prevention of cholera—it is absolutely the only one recommended. . . . I vaccinated these hogs in every particular as described and recommended by the defendant. That method is the proper and correct method of doing it. From my standpoint as a professional man, there was no objection found to the directions they gave me. . . . A hog could have contracted hog cholera, and you wouldn't be able to recognize the fact with a thermometer test. If the hogs had contracted the cholera I could not have told short of six days by a test. It is possible these hogs could have

had the cholera at the time I vaccinated, and I would not have known it.''

It is further shown that defendant is one of the largest and most reputable concerns of its kind; that this hog cholera remedy is not a secret or patented remedy but is prepared by a number of firms and its manufacture is open to all; that its preparation is regulated and supervised by the Agricultural Department of the United States Government and by most of the States (See Sec. 8785, U. S. Compiled Statutes 1916); that the defendant is and was duly licensed and supervised; that its methods of preparing virus and serum, the prescription and directions for its use, the dosage and all printed matter on and enclosed with the packages containing the virus and serum have the approval of the Agricultural Department of the United States.

In this state of facts the case was submitted to the jury without instructions outlining any theory on which defendant would be liable except an instruction telling the jury that if they found for the plaintiff to assess his damages at the market value of the hogs lost by plaintiff, ''if you find from the evidence that plaintiff lost any hogs on account of the medicine mentioned in evidence being poisonous, and further find that said medicine or remedy was administered as per the directions of the defendant.''

This instruction plainly implies that the jury need find but two facts to make defendant liable: (1) that the medicine was poisonous, and (2) that is was administered according to the printed directions. That it is more or less poisonous i. e., disease producing, is conceded, and this was known to both Dr. Winters and plaintiff. The effect of this instruction, therefore, is to make defendant an insurer of this remedy if administered according to the directions. Certainly this is not the law and it does not support a case based on negligence. The negligence alleged in the petition, that defendant negligently failed to divulge or make known to Dr. Winters or plaintiff the dangerous and

poisonous character of this remedy, is completely refuted by the evidence. Nor is there any negligence shown in the preparation of the particular virus used on plaintiff's hogs. The plaintiff's evidence is entirely silent on that point, while defendant's evidence is that all of it was prepared in the most careful and approved method.

The sole fact on which negligence on the part of the defendant is predicated is that the hogs all took sick with the symptoms of hog cholera and so many of them died. That all of them would be more or less affected by being vaccinated with this remedy and that some would die therefrom, was to be expected. It is said that no scientist or chemist has yet been able to detect any difference in the composition of the virus and the serum, the poison and the antidote, the blood of a sick hog and the blood of one after it has recovered. Why one produces disease and death and the other arrests and cures, is largely speculation. Why some hogs apparently healthy and in the same herd and conditions are expected to die when the same treatment is given to all is a matter not explained and doubtless not known. Much, doubtless, depends on the vitality and physical condition of the individual hog and this is difficult or impossible to ascertain. It is pretty well established that in its incipient stages hog cholera cannot be detected and when it has advanced to the stage where the symptoms are discernable it is too late for most hogs to yield to the antidote or serum. This is true of the disease, whether resulting from the usual contagion or caused by the injection of the virus. We might conjecture, therefore, judging merely from results, that these hogs already had the disease in its incipient stages and the serum administered after the additional injection of virus could not counteract the disease; or, judging merely from results, we might conjecture that Dr. Winters, however honest in his belief that he administered that remedy properly, made some mistake, misadventure or miscalculation, as we

198 M. A.—38

know that administering too much of the virus or too little of the serum would result as this did. These are mere conjectures, of course, but so too, is it a mere conjecture that there was some negligence in the preparation of the virus used. The mere fact that injury resulted from the use of this virus in the way it was intended to be used is not sufficient to prove negligence in its manufacture. There must be evidence from which the negligence counted on is fairly and reasonably inferable. It is not enough to show accident and injury, but "where all the acts connected with the accident fail to point to the negligence of the defendant as the proximate cause of the injury, but show a state of affairs from which an inference could as reasonably be drawn, that the accident was due to a cause or causes other than the negligent act of the defendant,. the plaintiff cannot rely on the mere facts or circumstances, nor is the defendant called upon to explain the cause of the accident or purge itself of the inferential negligence." [McGrath v. St. Louis Transit Co., 197 Mo. 97, 94 S. W. 872; Smith & Son v. Railroad, 177 Mo. App. 269, 164 S. W. 132; Rowden v. Daniell, 151 Mo. App. 27, 132 S. W. 23.] " If there is any other cause apparent to which the injury may be with equal fairness attributed, the inference of negligence cannot be drawn." Oil Co. v. Torpedo Co., 190 Penn. 350; Minneapolis General Electric Co. v. Cronon, 166 Federal, 657, in which it is said: "Where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought on the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half dozen causes and find that the negligence of the employer was the real one when there is no satisfactory foundation in the testimony for that conclusion; when the alleged injury may have been due to one or the other of the two causes, either one of which may have been the cause, there can be no recovery unless it is shown that between the two causes in question, it was the negligence of the defendant which caused the injury."

This case is different from any we find in this State. It is not a case where a person calls for and supposes he is buying and using a harmless drug or remedy and is given a poisonous one, as in Fisher v. Golladay, 38 Mo. App. 531; Kelly v. Ross, 165 Mo. App. 475, 483, 148 S. W. 1000. It is in some respects more like Fowler v. Randall, 99 Mo. App. 407, 73 S. W. 931, in that the party buying and using the remedy knew its dangerous character.

We may concede that a manufacturer or dealer in any article like this will be held liable to one poisoned by an article sold as being harmless, though the person injured was not the purchaser but a third person, provided the injury was the direct and natural consequence of the manufacturer's or dealer's *negligence* in the preparation of the poisonous article. [Darks v. Scudder-Gale Grocer Co., 146 Mo. App. 246, 130 S. W. 430.] That case, and most of those cited therein, deal with "articles intended to be taken into the *human system*" and the doctrine is said to rest on public policy for the preservation of life and health. We will grant without deciding that this doctrine extends to animals. The distinction between that case and this is that here there is no proof of negligence in the preparation of the article causing the damage.

We are confirmed in our view that plaintiff wholly failed to make a case by the able and learned opinion of the Supreme Court of Iowa in the recent case of Hollingsworth v. Midwest Serum Co., 162 N. W. 620, a case involving the loss of hogs from this same remedy, manufactured, however, by another company. In that case the same high death rate resulted from administering this remedy in the dosage and manner prescribed to apparently healthy hogs. That case is really a stronger one than this in that the plaintiff produced some evidence, held by the court to be insufficient however, bearing directly on negligence in the preparation of the serum used. In that case the same high death rate occurred in some herds while in others a low death rate ensued from the same treatment.

Cholera was prevalent in the neighborhood and it was said that this as well as other possible diseases may have already been present. The court held the evidence to support the verdict and remarked:

"This testimony, such as it is, furnishes something of an illustration of the easy door which would be open for the recoupment of cholera losses if the liability of a producer of serum could be predicated upon the mere fact that the serum failed to save. The business is well hedged about by the safeguards of government, both State and National. Adventurers cannot engage in it. Only men of competent experience can obtain license therefor. The plants are subject to continual official inspection. The power of governmental departments over them is practically unlimited. It is greatly to the interest of the public that effort and experimentation go on. A great degree of success has been attained. Continual discovery is being made. Even though the remedies have only partial success they are well worth while. The conclusion arrived at renders it unnecessary for us to pass on many legal questions which are ably argued in the briefs. The case presented occupies quite a new field. It is not a case of mistake in compounding medicine; nor a mistake of delivering a dangerous article in lieu of a harmless one; nor does it involve bad faith or fraud in putting the article into the channels of sale. Both purchaser and seller knew that in the use of the article uncertainty of result to some degree was inevitable. It was the duty of the producer to follow the approved methods of production and of testing, as generally recognized by those versed in the subject. Under the undisputed testimony he could do no more for general use."

The result is that the judgment is reversed. *Farrington* and *Bradley, JJ.*, concur.