C. E. HOWARD, Receiver, Appellee, v. UNITED SERUM COMPANY,
Appellant.

**ANIMALS: Loss or Injury—Impure Cholera Remedy—Measure of Care
1 in Manufacture.** A manufacturer of hog-cholera virus and serum
who, in a contract of sale, distinctly provides that he does not
guarantee said product "further than that it will be manufactured
strictly in accordance with the rules and, regulations as laid down
by the department of agriculture" of the Federal government (which
rules and regulations are distinctly comprehensive, in great detail,
and mandatory on all manufacturers by fiat of the Federal authori-
ties) may not be held liable in damages resulting from the purchase
and use of said product because he did not employ in the manufac-
ture . some *additional* precaution not required by said government
regulations, e. g., a bacteriological testing laboratory.

**ANIMALS: Loss or Injury—Impure Cholera Remedy—Evidence.** Evi-
2 dence tending to show that, after a purported hog-cholera remedy
was employed on hogs, they died of diseases which are prevalent
and common among hogs, is not competent to prove that said remedy
contained the germs of said diseases.

Headnote 1:  19 C. J. pp. 779, 780.  Headnote 2:  19 C. J. p. 785.

Headnote 1:  39 A. L. R. 397; 6 R. C. L. Supp. 1410.

*Appeal from Black Hawk District Court.*—GEORGE W. WOOD,
Judge.

DECEMBER 14, 1926.

Action for damages for loss of business resulting to plaintiff
from the use of defective virus and serum purchased from the
defendant, which is charged with negligence in the method of
the production of the same. The answer, so far as material for
our consideration, was a general denial. There was a verdict and
judgment for the plaintiff, and the defendant appeals.—*Re-
versed.*

*M. W. Borders* and *Arbuckle & Arbuckle,* for appellant.

*Mears & Lovejoy,* for appellee.

EVANS, J.—The Waterloo Serum Laboratories, Inc., was a
corporation organized by Dr. Cecil, as its sole incorporator and

stockholder and manager. It is represented here by a receiver, but, for the purpose of our discussion, we shall refer to the corporation itself as the plaintiff. The plaintiff handled hog cholera serum and virus, as a retail dealer, and was located at Waterloo. In January, 1920, it entered into a written contract of purchase of this hog cholera remedy from the defendant. The contention presented is that the product delivered to it by the defendant was impure, in that it contained the germs of hemorrhagic septicemia and necrotic enteritis; that such diseases were communicated by its use in vaccination to the vaccinated pigs; and that there was large mortality among such vaccinated pigs, resulting from such diseases. The further contention is that such results so operated upon the reputation of plaintiff's business that such business was virtually destroyed. Damages are claimed to the amount of $40,000. Plaintiff pleaded that, in January, 1920, it entered into a written contract for such products with the defendant. The portion of such contract which is material for our consideration was as follows:

1. ANIMALS: loss or injury: impure cholera remedy: measure of care in manufacture.

"It is further agreed and understood by the parties hereto that the United Serum Company does not guarantee the serum and virus mentioned in this contract further than that it will be made and manufactured strictly in accordance with the rules and regulations as laid down by the department of agriculture and that they will not be responsible for any representation or guaranty made by the party of the second part further than above mentioned. It is further understood and agreed that the serum and virus herein referred to is to be manufactured or produced under the present rules, regulations and inspection of the department of agriculture and under the license issued to the Stockyards Serum Company, and any revocation of said license shall render this contract null and void."

The petition set forth six alleged grounds of negligence in the method of production of the product delivered pursuant to the foregoing contract. Specifications 4 and 6 were withdrawn from the jury by the court. Those submitted were Nos. 1, 2, 3, and 5, as follows:

"1. That the defendant, while said alleged remedies were in the process of preparation, kept their animals in inclosures which

were not properly disinfected or rendered clean and free from disease germs, such as are discovered in Count 1 hereof.''

''2. That said pens or inclosures in which the animals were kept, and whose blood was used in the manufacture or preparation of the alleged remedies, were in fact infected with the disease germs and deleterious substances described in Count 1 hereof, and to the knowledge of this defendant, or that knowledge by the defendant could and would have been obtained by the use of ordinary and reasonable care.''

''3. The pigs from which the blood was drawn to be used in the manufacture of said serum and virus, were not 'susceptible' pigs and were not healthy animals, but were, or some of them were, suffering from the diseases or sickness referred to in Count 1 of this petition; that as a result the serum and virus were likewise infected or infested therewith, resulting in the communication of said diseases to the hog subsequently treated by the use of said alleged remedies.''

''5. The defendant failed and neglected to maintain at its plant for the manufacture of said remedies any laboratory or laboratory facilities for the purpose of testing the product, either during its manufacture or afterwards, for the purpose of ascertaining either its potency or its freedom from injurious substances and disease germs.''

The defendant demurred to the petition on the ground that no specification of negligence therein was predicated upon any breach of the government regulations for the production of such remedy. This demurrer was overruled. The defendant saved an exception to the ruling, and presents the same in one of its assignments of error. The question presented was saved throughout the trial by proper objections to evidence and by proper requests for instructions. We find no evidence in the record that would justify the submission of Specifications 1, 2, and 3. The purported support of such specifications is purely argumentative. The fifth specification of negligence is not only supported by the evidence, but is conceded by the defendant. The controlling question at this point is whether the fact set forth in such specification constituted negligence, either as a matter of law or fact. It will be noted that the damages claimed by the plaintiff are apparently remote from the first cause herein specified, but we shall carry our discussion no further than to consider whether, upon

this record, it can be said: (1) That the product delivered to the plaintiff contained the germs of hemorrhagic septicemia and necrotic enteritis; (2) that the defendant was guilty of any negligence in its method of producing the product delivered to the defendant.

Incidentally, also, the consideration of the first of these questions involves the question whether the use of the serum was the proximate cause of these diseases in the hogs upon which it was used. Appellant has assigned a large number of errors. We shall not consider them seriatim. All the material questions in this case resolve themselves into one comprehensive one; and that is whether the methods and standard laid down by government regulations make up the standard which measures the duty of the defendant, and whether a careful compliance with all such regulations by defendant still leaves it subject to a charge of negligence on the ground that it failed to observe some additional precaution, not required by government regulation. The specification is that the defendant had no "laboratory facilities" for testing its product. The conceded evidence is that it had no bacteriological laboratory. It is not claimed to have been lacking in any other "laboratory facilities." Its plant was a laboratory, and all its facilities were under the supervision of, and had the approval of, government agencies. There was no lack of test requirements in the government regulations. The required test, however, was not bacteriological. The method of testing will be set forth later. Of the many expert witnesses testifying at the trial, none testified that a bacteriological test was essential, save Dr. Cecil. He predicated his opinion solely upon the fact that a test could be so made. It would require some weeks to make each test. Such test would not be accepted as sufficient by government regulations. It appears, also, that there are 57 plants engaged in this production, all under the supervision of the government. The production of serum and virus is the exclusive product of 52 of these plants. None of them use the bacteriological test. The five other plants are engaged in producing not only serum and virus, but other products, which require bacteriological examination. It is shown that these plants have bacteriological laboratories. Whatever support, therefore, the fifth specification has, it is in these facts now stated.

It is to be borne in mind that the Federal government has

asserted its authority over the business of producing these cholera remedies. It has done so in the exercise of its legitimate police power.. The persons who own and operate these plants are not at liberty to substitute their own judgment for the government regulations. In that respect they are not free to do as they will with their own. The remedy is the result of many years of research and expert experiment. It is empirical in its character, and nobody knows just why it operates as it does, nor why it fails at times to meet expectations. Both the serum and the virus are merely the defibrinated blood of a hog. The virus is obtained from the blood of a hog having cholera; the serum is obtained from the blood of an immune hog. No actual difference in the composition of serum and virus has ever been discovered. Neither chemical analysis nor microscopic examination discloses.any difference. The cholera germs appear never to have been discovered, or isolated. Therefore, all the government regulations are formulated and predicated upon the results of actual experiments, covering many years of time. To depart from these regulations is to take the risk of losing the benefit of the composite knowledge acquired by many years of expert experiment. . But whether it be wise or unwise for any owner or manager of a plant to depart from such regulations, either by adding thereto or subtracting therefrom, yet he has no liberty to do.so. Every. precaution for a perfect result in the production which the ingenuity of experts can devise, is included in the government regulations. The final testing of the product required by the government, before the product can be put upon the market, was described by the witness Dr. Imler, who is, and has been for many years, the chief government inspector for the territory including Kansas City, the location of this plant. This was as follows:

"The test to which serum and simultaneous virus were at the time subjected before being marketed consisted of inoculating healthy susceptible pigs. In the case of hog cholera serum, a sample of each batch of serum is collected by the inspector. In conducting the test, the establishment furnishes seven healthy pigs, susceptible to hog cholera. The inspector makes an inspection of them, which includes an examination as to their suitability, temperature, and weight of the pigs, to ascertain whether or not they comply with the regulations covering those points.

Then the pigs are placed in a separate pen, and the inspector personally inoculates each of the seven pigs with 2 C. C. of hog cholera virus. He then observes an employee of the establishment inoculate five of the seven pigs which he has inoculated with virus, with 20 C. C. of anti-hog-cholera serum, taken from the sample which the inspector has collected. The inspector designates the pigs which are to receive virus and those which are to receive virus and serum. After this operation is concluded, the inspector makes a daily observation,—in fact, he may make several observations on each day for a period of at least 21 days subsequent to their inoculation,—and he keeps a detailed record of his observations. This observation includes an observation as to their physical condition,—whether they remain well or become sick. At the conclusion of the twenty-one-day period, he renders a decision as to the results of the test. The rules and regulations provide certain criteria or standards by which these tests shall be had. A test more or less similar to that is conducted also as to the virus pigs, and was so conducted in 1920. The purpose as to the serum is to test it for purity and potency; in other words, to establish as to whether or not it would protect animals against hog cholera, and as to whether or not it contains any impurities,—disease-producing organisms. The test on the virus is for practically the same purpose: that is, to determine whether or not there is present the germs of any other disease than cholera. The portion of these tests which I saw were conducted in accordance with the rules and regulations. Under the law and the rules and regulations, the department is required to keep permanent records, as a part of its regular files, as to the results of these tests, and such records are kept. * * * Before this test which I have described is commenced, serum and virus is drawn from the hogs and placed under government lock and key. It is released to the establishment for marketing whenever it has satisfactorily covered all the required tests. So that, until that serum and virus passes this test and the other test of post-mortem examination, it cannot be taken from the government vault for marketing. The words 'U. S. Released,' as applied to virus and serum at the time these regulations were in effect, was an assurance that the products bearing these marks had complied with all of the provisions of the regulations in force at that time, and that, when they had thus been prepared, they

were not worthless, contaminated, dangerous, or harmful. They were obliged to place that label on all serum released. As to whether or not these rules and regulations are the minimum requirement of all that is necessary for making a reasonably safe and good product, my guess is that they are not a minimum requirement. They are the requirement of all that is necessary to reasonably insure that the products will be pure and potent, and my opinion is that they are reasonably good products when made in conformity with those rules and regulations. By a reasonably good product I mean that they will accomplish the purpose for which they are intended,—that of preventing hog cholera,—and that they do not contain organisms that will produce other diseases, and that serum and virus made under these rules and regulations would not contain the germs of necrotic enteritis or hemorrhagic septicemia. * * * As to the value of bacteriological examination for the purpose I have described, my opinion is that it would be of a questionable value, unless confirmed by the inoculation of animals such as required by the government regulations. In other words, the government skips over the intermediate and gets to the final best test. We made some investigation about the first of this year as to the amount of serum and virus which has passed under my control during my experience as an inspector in charge of the Kansas City department, and there was in the neighborhood of a billion and a half cubic centimeters. The number of plants included varied from time to time, probably between 14 and 25. In 1920, I believe there were about 24 or 25 plants. In all my experience I have never heard of that serum or virus' containing the germs of necrotic enteritis or hemorrhagic septicemia. There are now under my supervision 22 such plants. * * * In all my experience, I have never known of any instance where serum or virus was destroyed, after having been tested, for the reason that it contained disease-producing germs, if the test had been satisfactory. Serum and virus may be destroyed because it becomes frozen, or the containers become broken, or its identity lost by the label coming off.''

It will be noted from the testimony of this witness that he has been government inspector constantly in supervision of this plant, as well as others, and that the selecting and the testing are all done by the inspector. This test is made for purity, as

well as for potency.  It is the government inspector who has supervision over the entire process, who gives the final approval to the product and releases it to the market.  The methods of preparation will be found fully described in our opinion in *Hollingsworth v. Midwest Serum Co.*, 183 Iowa 280.  The evidence in the present record is the same as in that, as to such description.  We will not repeat the same herein.  It appears from this record that, upon the completion of the test of each case, the government reserves two retest samples of 250 cubic centimeters from each batch or serial that is put upon the market.  These samples are carefully preserved for future use, if necessary.  If any complaints of results are received, a retest is made from these samples.  It appears also that Dr. Jay, a local veterinary surgeon, and one of the plaintiff's witnesses, who had much mortality in some of the herds which he vaccinated, wrote to his brother, who was in the service of the government in this department, questioning the purity of this product.  This letter was referred at once by the recipient to Dr. Imler, who at once started an investigation and caused a retest of the samples to be made.  They were found to be pure.  Dr. Imler also caused a letter to be written to the plaintiff company, advising it of the inquiry, and asking for full information as to the results of the use of this serial number, specifying the same.  No reply being received to this letter, two ''follow-up'' letters were sent, one week apart, to the same purport.  No reply was received to any of the letters.  The foregoing illustrates briefly the methods and precautions adopted by the department to guard against all mistakes. The regulations which were imposed upon the producer by the government are printed in pamphlet form, and cover 33 printed pages.  They deal apparently with every conceivable detail involved in the method of production.  To say that the producer must conform to all these regulations, regardless of his own judgment, and yet that he shall be subject to an action for damages, upon the mere opinion of others that there was a better and more prudent course which should have been followed, is to challenge the legitimate exercise of the police power of the Federal government.  We hold, therefore, that the plaintiff cannot predicate negligence upon the fact that the defendant did not maintain a bacteriological laboratory or conduct a bacteriological test.

Our conclusion at this point is of itself fatal to the plaintiff, and we shall not prolong this opinion by entering into a discussion of other features of the case. We ought, perhaps, to say that we find no competent evidence in the case to the effect that this product contained the germs of hemorrhagic septicemia or of necrotic enteritis. Four veterinary witnesses testified to their opinion that it must have contained such germs. Each opinion was confessedly predicated upon the fact that hogs which had been vaccinated with the product developed these diseases, or one of them, and died therefrom. We held in the *Hollingsworth* case that such evidence was mere speculation. It has been held to the same effect by several courts in similar cases since the decision in the *Hollingsworth* case. *Brown v. Mulford Co.*, 198 Mo. App. 586 (199 S. W. 582) ; *Murphy v. Sioux Falls Serum Co.*, 47 S. D. 44 (195 N. W. 835) ; *Eagle Biological & Supply Co. v. Breed*, 90 Okla. 7 (215 Pac. 424) ; *Richards v. Mulford Co.*, 236 Fed. 677. We have also re-affirmed the ruling in *Balhorn v. Pitman Moore Co.* (Iowa), 200 N. W. 601 (not officially reported), and *Peterson v. Dolan*, 186 Iowa 848.

It appears without dispute that these diseases are prevalent swine diseases, and that their germs may usually, if not always, be found in hog yards and hogpens, in a dormant state. Their virulence or lack of it varies. How much of this variation depends upon the germs, and how much upon the particular animal that is attacked by it, no one seems to know. They are usually taken into the system of the hog either through its breathing organs or its alimentary organs, and not otherwise. They are usually present in their virulent form as secondary diseases. That is, they come to the aid of some other disease. Hemorrhagic septicemia is often present in cholera cases. These facts are undisputed. They may fairly be termed natural diseases of the Iowa hog, thousands of which die every year therefrom, and no one pretends to know where the germs come from. They are always present, dormant or otherwise, in the near vicinity of the hog. To say, therefore, in a particular case, that this or that hog took the disease from the vaccine, is a mere arbitrary guess which is not entitled to rank as admissible evidence. Under the Federal regulation, the test of the production is in its affirmative success,

*2. ANIMALS: loss or injury: impure cholera remedy: evidence.*

even though other tests may have shown failure. In the *Hollingsworth* case we said:

"Under the Federal regulations, the rule is that, upon the failure of a test, subsequent tests may be made; and if a subsequent test is successful, it is deemed sufficient, notwithstanding previous failures. In such case, the previous failure is attributed to other causes than the serum. On this theory, the fact that a herd of 118 should be saved, like Herd No. 7, in Dr. Alcorn's experience, is evidence that the loss of Herd No. 1, of 70 pigs, was attributable to other causes. Under the rule of the eight-pig test, as recognized by all the experts, a failure of the test proves nothing affirmatively. It forbids the marketing of the product, however, until the conditions are met by a subsequent test."

These regulations recognize that there may be other causes, even though undiscoverable, for the death of the hog. In the record before us, the plaintiff called ten veterinarians as witnesses, who had used this serum and had found great mortality in certain herds. Of these ten veterinarians, only three found hemorrhagic septicemia. Only one of them found it as a primary disease, responsible alone for the death of the hog. One found it in conjunction with necrotic enteritis, and the third one found it in conjunction with cholera. The other five veterinarians found that cholera was the cause of death. These same witnesses had used this same product in the same season in the vaccination of more than 17,000 hogs. The total mortality from all causes was 196. True, the mortality complained of was not distributed, and the excessive mortality was in a limited number of herds. But the fact that by the use of the same vaccine such a large number could survive is very suggestive of other causes for the mortality than the vaccine itself. Swine diseases acquired naturally do result in great mortality in particular herds, and even in full extinction thereof. The appellee assumes to distinguish this case from the *Hollingsworth* case on the ground that only the purity of the vaccine is challenged here, whereas its potency was challenged in the *Hollingsworth* case. So far as the legal principle is involved, we observe no such distinction as would save the plaintiff's case. What was said in the *Hollingsworth* case has much application to the present record:

"This testimony, such as it is, furnishes something of an

illustration of the easy door which would be open for the re-
coupment of cholera losses if the liability of a producer of serum
could be predicated upon the mere fact that the serum failed
to save. The business is well hedged about by the safeguards of
government, both state and national. Adventurers cannot en-
gage in it. Only men of competent experience can obtain license
therefor. The plants are subject to continual official inspection.
The power of governmental departments over them is practically
unlimited. It is greatly to the interest of the public that effort
and experimentation go on. A great degree of success has been
attained. Continual discovery is being made. Even though the
remedies have only partial success, they are well worth while.
* * * The case presented occupies quite a new field. It is not a
case of mistake in compounding medicine, nor of mistake in de-
livering a dangerous article in lieu of a harmless one, nor does
it involve bad faith or fraud in putting the article into the chan-
nels of sale. Both purchaser and seller knew that, in the use of
the article, uncertainty of result, to some degree, was inevitable.
It was the duty of the producer to follow the approved methods
of production and of testing, as generally recognized by those
versed in the subject. Under the undisputed testimony, he could
do no more, for general use. If further testing were deemed
desirable for added security as to a particular herd, the pur-
chaser had the opportunity to make it upon a few of the par-
ticular herd which he was about to inoculate. Before inoculating
a herd of 210 pigs, as was done in one case, it might have been
more prudent to have first selected eight pigs and experimented
thereon. The prudence, if any, of such a course must have been
as obvious to one veterinary surgeon as to another. What we
hold, therefore, is: That the burden was upon the plaintiff to
show that, in the production and testing of the serum, the de-
fendant violated some duty owing to the public or to the vendees
of the product * * *.''

The arguments deal to some extent with the question whether
it is permissible for any person to contract against his own negli-
gence. The suggestion is that the defendant was bound to due
care in the manufacture of the product which it delivered to the
plaintiff pursuant to its contract, notwithstanding that the con-
tract specified the regulations of the Federal government as the
standard which was to govern. This is not a case of contracting

against liability for negligence.   Negligence is a breach of duty. The function of the contract in this record is to disclose what the defendant's duty was thereunder.   It specified the details of that duty by reference to the government regulations.   A breach of duty on its part would be a breach of the contract.   The contract clearly adopted the Federal regulations as the standard of conduct on the part of the defendant.   Having conformed to those regulations, the defendant is not subject to a different standard which exists in the mere conception of witnesses.   The product having been produced according to the methods laid down and supervised by the Federal government, and the same having been delivered to the Federal inspector for final testing, that test may not be contradicted by mere argumentative evidence.   We have no occasion to discuss other features of the record.

The defendant's motion for a directed verdict ought to have been sustained.—*Reversed.*

DE GRAFF, C. J., and ALBERT and MORLING, JJ., concur.