**Stuart DENMAN, Plaintiff**

**v.**

**ARMOUR PHARMACEUTICAL COMPANY and L. A. Mosher Company, Defendants.**

**No. DC 6919–K.**

United States District Court,
N. D. Mississippi,
Delta Division.

Dec. 31, 1970.

Harvey Henderson, Sumner, Miss., Alfred G. Nicols, Jr., McLaurin & Nicols, Brandon, Miss., for plaintiff.

R. N. McNutt, Fred M. Bush, Jr., Fred M. Bush, III, Mitchell, McNutt & Bush, Tupelo, Miss., for Armour.

Frank W. Hunger, Lake, Tindall & Hunger, Greenville, Miss., for L. A. Mosher Co.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this diversity action plaintiff, Stuart Denman, a Mississippi citizen, sued defendants, Armour Pharmaceutical Company (Armour), a Delaware corporation, and L. A. Mosher Company (Mosher), a Georgia corporation, for $46,000 damages allegedly sustained when plaintiff's herd of swine suffered an outbreak of hog cholera after being vaccinated with a modified live virus vaccine for the immunization of hogs against that disease. Plaintiff asserts that the vaccine, which Armour manufactured and marketed under the brand name "Bon-Ecine" and which Mosher distributed to the trade, was defective in that it failed to immunize hogs vaccinated with the product against hog cholera, and that both defendants were liable for the vaccine product on alternative theories of warranty, strict liability in tort, and negligence. By separate answers each defendant denied liability for the loss, with Mosher entering a cross-claim against Armour, contending that in the event Bon-Ecine was found to be a product that was unreasonably dangerous and defective, Armour, as its manufacturer, should indemnify Mosher since the latter received and sold the vaccine in original sealed bottles never opened prior to being sold to the user.[1]

In June 1967 and for several years previously, plaintiff conducted a feeder pig operation on his farm in Tallahatchie County, Mississippi. In the course of this operation he customarily bought feeder pigs when 8 or 10 weeks of age and weighing about 40 pounds, maintained and fed them on his farm for about 4 months, and then sold them at a weight of approximately 200 pounds. At all pertinent times plaintiff had some 2000 pigs on hand, which he acquired either from various Mississippi feeder pig auction sales or by private treaty from approximately 20 Mississippi swine producers within a 20-mile radius of his farm. After their purchase, the pigs were maintained on plaintiff's farm in 4 different barns having a total capacity for 1600 pigs and also in open pastures.

In late June and early July 1967 certain pigs became ill and failed to respond to antibiotics. They exhibited common symptoms indicative of hog cholera, and by July 3, 50 pigs in barn No. 1 had died. On July 4, the disease, then reaching epidemic proportions, was diagnosed as hog cholera by Dr. Stuart Denman, Jr., a licensed veterinarian and son of the plaintiff. This diagnosis was promptly confirmed by findings from the State Testing Laboratory at Jackson, where tissue samples and autopsies revealed internal lesions typical of hog cholera. Thereupon a hog cholera quarantine was imposed upon plaintiff's farm, which was not lifted until the following October. From July 1 until August 3, 453 of plaintiff's pigs died from hog cholera. While there had been no history of hog cholera on plaintiff's premises at any time, outbreaks of hog cholera elsewhere in North Mississippi in 1967 were reported to, and confirmed by, the State Veterinarian.

Of approximately 2000 pigs on hand at the inception of hog cholera, plaintiff during the preceding four months had purchased about 890 from 5 auction sales where all such pigs had been vaccinated against hog cholera. This was done by licensed veterinarians who used a product other than Bon-Ecine and identified the pigs so vaccinated by notch in the lower portion of the right ear. Of the number acquired from feeder pig sales and so

---

1. At time of trial Armour confessed the cross-claim in event plaintiff should prevail and thus acknowledged its responsibility for any liability cast upon Mosher as distributor of Bon-Ecine.

vaccinated, 6 pigs are known to have died. During the same four months the remaining 1100–1200 pigs had been purchased by plaintiff from neighboring producers. Some of these pigs, the number of which is sharply disputed, were unvaccinated at the outbreak of cholera. The balance of the pigs, to the extent that they were vaccinated, had been vaccinated with Bon-Ecine by Dr. Denman either while they were still owned by the original producers or after their purchase by the plaintiff, who would then move them onto his farm. Dr. Denman used only Bon-Ecine as a vaccine; and when he vaccinated a pig, whether before or after purchase by plaintiff, Dr. Denman would distinctively mark the pig by making a notch in the upper portion of the right ear. Plaintiff's evidence indicated that of the total number of pigs dying from hog cholera, at least 258, if not more (308), had been so notched or marked as vaccinated with Bon-Ecine.

In July, after the hog cholera outbreak had become widespread, Dr. Denman notified Armour's home office about the problem encountered with Bon-Ecine. Armour sent Dr. Jacobson, its field representative, to plaintiff's farm, and Dr. Jacobson confirmed that the pigs were dying of hog cholera. He recommended that all pigs be revaccinated with Certigen, a modified live virus vaccine manufactured by another manufacturer. In accordance with this recommendation, on July 19, 1150 pigs were revaccinated. The survivors of the herd suffered some adverse effects by going off feed and losing weight, but in due course were sold at 150 pounds weight.

For about a year prior to this incident Dr. Denman had used Bon-Ecine for vaccinating pigs without receiving any complaints. His custom was to purchase the vaccine from Mosher, who shipped the material to him from Memphis, Tennessee, vacuum packed, and in a refrigerated condition. A single package contained two small glass vials, one enclosing the dry vaccine and the other a sterile diluent; these were to be reconstituted as five doses and used in accordance with manufacturer's directions. The box containing the two vials bore the label "Bon-Ecine—for the Immunization of Healthy Swine Against Hog Cholera". Dr. Denman followed the recommended practice of injecting a dose of hog cholera serum concentrate, a preparation which was made by another company, simultaneously with the injection of Bon-Ecine. There is no indication that Dr. Denman departed from Armour's printed instructions for administering the vaccine or that he allowed the medicine to become unrefrigerated or otherwise lose its potency.

The evidence shows that modified live virus hog cholera vaccine is manufactured by various American companies under license granted by the United States Department of Agriculture; and when used in conjunction with hog cholera serum concentrate, it is the best-known means of preventing hog cholera. The serum provides passive immunity for approximately 21 days and thus allows the modified live virus vaccine, injected at the same time, to produce a permanent immunity after 14 days. It is a known fact that the modified live virus vaccine is not 100% effective and may not provide immunuity in from 5 to 15% of the hogs vaccinated. Inasmuch as the vaccine contains the live cholera virus, even though modified and attenuated, it can in certain circumstances cause a low-grade non-virulent type of hog cholera which, through shedding and passage of wastes, may possibly produce clinical hog cholera in other swine. In 1967 the veterinary profession was aware of these capabilities, inherent limitations and possible hazard of modified live virus hog cholera vaccine.

Under a government license Armour manufactured the Bon-Ecine product, which is a modified live virus vaccine of homologous tissue culture origin. The manufacture of this product was subject to rigid government regulations, tests and inspections. In 1967 at its Omaha, Nebraska, laboratories, Armour manufactured, tested and sold, among its total production, the two lots of Bon-Ecine

which are involved in this case, No. 392–B consisting of 70,900 doses and No. 396–A consisting of 36,875 doses. Each lot was manufactured according to prescribed procedures, was carefully and successfully tested by Armour employees and spot checked by government inspectors for potency in immunizing hogs against hog cholera. Once packaged, the vaccine was kept refrigerated at 35 to 45° F. Armour sold some of the vaccine from both of the lots to Mosher, and the vaccine which was shipped to Mosher at Memphis, Tennessee, was properly packed and handled, was shipped under proper refrigeration and arrived at its destination in unbroken bottles and packages. The vaccine was then stored at the correct temperature by Mosher until its sale. During the months of April, May and June 1967, Mosher sold vaccine from both of the lots to Dr. Denman and shipped the material under refrigeration by bus from Memphis to the purchaser's veterinary clinic at Charleston, Mississippi. Upon its arrival at Dr. Denman's office, the vaccine was kept at all times under refrigeration and in vacuum-packed bottles until the time of its actual use.

The undisputed evidence shows that hog cholera is a highly contagious disease, easily passed to pigs without immunity; and that the onset of the disease is insidious, as cholera symptoms do not appear until three weeks following the start of the virus incubation. Furthermore, a pig infected with the virus for as much as five days before vaccination will likely die from a fully virulent strain of hog cholera, described by the witnesses as a lethal virus capable of exterminating 95% of a susceptible herd.

In his complaint and at trial plaintiff contended he should recover against both Armour and Mosher on three separate grounds: (1) in warranty since defendants represented Bon-Ecine, without disclaimer or qualification, to be capable of immunizing healthy swine against hog cholera; (2) strict liability in tort since defendants sold Bon-Ecine in a defective condition unreasonably dangerous for use as a vaccine against hog cholera and they expected the product to reach plaintiff as a consumer without substantial change in its condition, which, according to plaintiff, is what occurred; and (3) negligence of defendants in the manufacture, handling or shipping of the product, thereby rendering it impotent as a vaccine, and in this respect plaintiff invoked the doctrine of res ipsa loquitur. In his sworn testimony plaintiff computed his total damages to be $46,222.96 itemized in the margin below.[2]

Defendants argue that no recovery can be allowed upon warranty because of the absence of both privity and an express warranty that the vaccine would prevent hog cholera; that strict liability in tort may not be predicated upon sale of a product, which although not absolutely reliable, cannot be made more reliable according to the best-known methods and is not unreasonably dangerous; and that the evidence rebutted any finding of negligence by defendants in the manufacture, handling or shipment of Bon-Ecine, making res ipsa loquitur inapplicable to the case. Finally, defendants, irrespective of any theory of liability, urge that plaintiff failed to establish that Bon-Ecine was defective or its impotency as a vaccine was proximately related to the death of any pig from hog cholera or consequential damage to the surviving herd, and that this failure of proof is fatal to the whole case.

In this diversity case we look to the law of the forum state, Mississippi, to

2. (1) $7,700.00 loss of 308 pigs at $250 each (plaintiff's counsel conceded, however, that this number should be reduced to 258 pigs)

(2) $1,627.16 veterinary services, drugs and extra pharmaceuticals

(3) $564.40 hauling, burning and disposing of dead carcasses

(4) $6,661.69 additional feed for surviving herd

(5) $29,669.71 lost profits due to weight loss, stunting and slow development of surviving herd

determine the substantive rights of the parties.[3]

It has been well settled that Mississippi recognizes the doctrine of strict liability in tort as set out in § 402 A of the Restatement of Torts 2d, and has positively discarded any requirement of privity in cases of strict liability for the manufacture of defective products ever since the landmark decision of State Stove Manufacturing Co. v. Hodges,[4] where Chief Justice Ethridge quoted from § 402A of the Restatement as follows:

"Special Liability of Seller of Product for Physical Harm to User or Consumer—

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The foregoing rule is not exclusive. It does not preclude liability based upon the alternative ground of negligence of the manufacturer or seller, where such negligence can be proved." 189 So.2d 118.

The principle of strict liability in tort has been extended to sales of goods, such as food or drugs for animals which involve no recognizable risk of personal injury and are foreseeably dangerous only to property.[5] We perceive no good reason why strict liability should not be applicable to this case since modified live virus vaccine is not an experimental drug, but a well-established one with known capabilities.

As to claims based upon warranty, express or implied, the present state of Mississippi law is somewhat less clear. Since the Mississippi Uniform Commercial Code provisions on warranties [6] did not take effect until March 31, 1968, or nearly a year after Dr. Denman purchased the vaccine in question, the standards imposed by that statute do not govern this case. Mississippi has never adopted the Uniform Sales Act and the common law of the state is also unclear on whether privity is required in warranty cases. In *State Stove*, Chief Justice Ethridge, after reviewing the earlier Mississippi cases on warranty, concluded: "In the absence of privity, the liability is in tort and not in contract, and a concept of warranty from the contract law of sales is irrelevant." 189 So.2d 113, 119. Therefore, it is not certain that the State Supreme Court has dispensed with a requirement of privity in suits based upon warranty although the modern view of most jurisdictions is certainly to that effect. It may be that, as some courts have observed, there is no practical difference between the strict liability in tort and warranty theories, the difference being largely one of terminology.[7]

3. Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841 (5 Cir. 1967).

4. 189 So.2d 113 (Miss.1966), cert. denied, Yates v. Hodges, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784. See Yates v. Hodges, (N.D.Miss.W.D.), 269 F.Supp. 519 (1967).

5. Prosser, Torts, 661, 663 (3rd Ed.1964).

6. Miss.Code Ann. § 41A:2–313 et seq. (Special Supp.1967).

7. Davis v. Wyeth Labs. Inc., 399 F.2d 121 (9 Cir. 1968).
It has been remarked that strict liability as imposed by § 402A of the Restatement is "hardly more than what exists under implied warranty when strip-

■ Nevertheless, we need not reach those interesting questions, nor make an *Erie* divination as to the remedies provided by state law since we have concluded that, assuming that plaintiff has standing to sue both defendants under any and all of the three theories advanced, he has failed to carry the burden of proving that Bon-Ecine was defective, and its condition as a vaccine proximately caused the losses sued for. Since this basic element, which is a sine qua non under any rule of liability, has not been established by a preponderance of credible evidence, the court is compelled to deny recovery upon the reasons that follow.

Plaintiff offered no direct evidence that Bon-Ecine was defective, nor did he present any analysis or data establishing that the vaccine received by Dr. Denman lost its potency. Instead he relied solely upon the circumstance that at least 258 pigs timely vaccinated with Bon-Ecine died of hog cholera and that this is sufficient to support a reasonable inference that the Bon-Ecine was a defective product. Plaintiff's position is that while Bon-Ecine did not directly cause any pigs to contract hog cholera, it was unsafe for use as a vaccine because it failed to produce immunity against the disease in so many pigs.

■■ It is well settled that a fact may be proved by circumstantial evidence, provided the circumstances are such as to take the case out of the realm of conjecture and place it in the field of legitimate inference, Denman v. Denman, 242 Miss. 59, 134 So.2d 457 (1961); and the trier of fact is not obliged to resort to surmise to any material degree in reaching its conclusions. Fournier v. United States, 220 F.Supp. 752 (S.D.Miss.1963). While circumstantial evidence may be even more satisfying and persuasive than direct evidence, the circumstances must be so proven that the conclusion sought to be thereby established must be a reasonable and probable one, and must follow logically from the facts. An excellent statement of the rule appears in 32A C.J.S. Evidence § 1039, pp. 753–755:

> "For circumstantial evidence to be sufficient to warrant the finding of a fact, the circumstances must lead to the conclusion with reasonable certainty, and must have sufficient probative force to constitute the basis for a legal inference, and not for mere speculation; but it is generally held that for circumstantial evidence to be sufficient, absolute certainty is not required. The conclusion must be a reasonable and probable one, and must follow logically from the facts."

When plaintiff's evidence is tested by the foregoing standard, this court must reject it for insufficiency not only as a matter of law but also as the trier of fact.

Assuming the correctness of plaintiff's evidence, we note that at the cholera outbreak he had on his farm about 2000 pigs made up of three categories: (1) 890 pigs purchased from authorized feeder sales, all timely injected with other vaccines of unquestioned effectiveness. Of that number 6 died in the epidemic; (2) 140 pigs purchased from a neighbor, Phil Shook, which, according to plaintiff's admission, were either unvaccinated or ineffectively vaccinated. Of that number 139—all but one—died of hog cholera; and (3) the remaining 970 pigs purchased from other neighbors and timely vaccinated with Bon-Ecine. Of that number 308 died of hog cholera. These deaths—6 from

ped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitation through inconsistencies with express warranties." Greeno v. Clark Equipment Co., 237 F.Supp. 427 (N.D. Ind. 1965).
We also note that breach of warranty actions began as torts. Grey v. Hayes-

Sammons Chemical Co., 310 F.2d 291, 295 (5 Cir., Miss., 1962), citing Prosser, "Assault Upon the Citadel (Strict Liability to the Consumer)", 69 Yale L.J. 1099, 1126 (1960). See also, Witherspoon, "Torts or Warranties", 39 Miss. L.J. 199–215 (1968).

the feeder sales, 139 Phil Shook pigs and 308 Bon-Ecine vaccinated pigs—comprise the 453 mortalities in the herd. The other 662 pigs timely vaccinated with Bon-Ecine survived and fared no differently than 884 feeder sale pigs. Since plaintiff's herd was subjected to hog cholera of a virulent strain, as shown by the fate of the Phil Shook pigs, the reasonable deduction is that all pigs surviving the epidemic did so because they were effectively immunized against the disease.

We are at once confronted with the plain fact that twice as many Bon-Ecine vaccinated animals survived as died from hog cholera. Plaintiff offers no explanation as to how "defective" Bon-Ecine immunized some pigs—which admittedly it did—and failed to immunize others. Dr. Denman having vaccinated all of the Bon-Ecine pigs in the same manner and under the same conditions, whether on or off plaintiff's farm at the time of their vaccination, we may not permissibly infer that any Bon-Ecine vaccinated pig dying of hog cholera was the victim of a defective product. Concluding that 308, or even 258, of the Bon-Ecine vaccinated pigs died because they were inoculated with a defective product would be mere conjecture, and would ignore all other relevant considerations. This is particularly true since no cases of hog cholera were reported to Dr. Denman by other clients whose pigs he vaccinated with doses from lots of Bon-Ecine identical to those here involved. These facts strongly rebut any notion that some of plaintiff's pigs were vaccinated with a defective product. More reasonable explanations would be that something was wrong with those particular pigs at the time of their injection or else the vaccine was improperly administered. Our conclusion that plaintiff's case under such circumstances is legally insufficient is amply supported by decided cases concerning hog cholera vaccines. Eagle Biological & Supply Co. v. Breed, 90 Okl. 7, 215 P. 424

(1923); Howard v. United Serum Co., 202 Iowa 822, 211 N.W. 419 (1926); Brown v. H. K. Mulford Co., 198 Mo.App. 586, 199 S.W. 582 (1917); Murphy v. Sioux Falls Serum Co., 47 S.D. 44, 195 N.W. 835 (1923). See Ann. 81 A.L.R. 2d 138, 164.

Plaintiff's reliance upon the Texas case of Hoover & Son v. O. M. Franklin Serum Co., 444 S.W.2d 596 (Tex.1969), is misplaced. In that case all 25 calves injected with an antibiotic serum immediately fell desperately sick, 11 died and the other 14 were permanently injured. Under these facts the jury was justified in believing that the violent reaction of 25 out of 25 calves injected with the drug was the direct result of a harmful product. This decision would be analogous if all, or nearly all, of the Bon-Ecine vaccinated pigs had died of hog cholera and the vaccine had caused the pigs to become infected with the disease.

Even if plaintiff's evidence is deemed sufficient to raise a factual issue, as the trier of fact we would not be justified by the proof in concluding that Bon-Ecine was defective and proximately caused plaintiff's losses. This factual conclusion is based upon the reasonable and probable deductions from the entire evidence, which contains certain conflicts to be resolved in favor of defendants. We are not unmindful of the testimony of plaintiff's veterinary experts who expressed the views that when the Bon-Ecine vaccinated pigs failed to acquire expected immunity and died, this fact suggested that the vaccine was not potent; and the cholera virus infecting the pigs without immunity probably came from other pigs which, having been effectively vaccinated with a modified live virus vaccine, were shedding live virus in their urine and other wastes while in the process of acquiring permanent immunity. With due respect to the experts, these opinions appear to rest on mere conjecture and surmise,[8] and must,

---

8. In his formal report dated August 20, 1967, Dr. Jon R. Lomme, regulatory veterinarian who investigated the epidemic on plaintiff's farm on behalf of the

therefore, be rejected by the court in the light of more reasonable explanations shown by the evidence to account for why the pigs, whether or not vaccinated, died of hog cholera, and plaintiff's losses cannot be reasonably attributed to a defective product sold by defendants.

We now proceed to a critical examination of the whole record, which reveals contradictions and discrepancies that materially impeach the testimony of plaintiff and his son. It is essential to resolve important disputed issues of fact. While plaintiff never conceded he had unvaccinated pigs in excess of the 140 purchased from Phil Shook, the facts are that in late June there were at least 354 unvaccinated pigs on his farm. In answer to interrogatories by defendants, plaintiff revealed that on June 9 he purchased 203 pigs from a neighbor, E. E. Shook, without a known history of vaccination, and these pigs had not been vaccinated by plaintiff at the time of the outbreak. Again, at least 11 pigs purchased from another neighbor, Charlie Kenright, had no vaccination record. These additional pigs, when counted with the Phil Shook purchase, would total 354 pigs without immunity; and they were dispersed throughout the different barns and pastures when hog cholera struck the herd. As a further complication, the proof shows that on July 14, which was at the height of the epidemic, plaintiff purchased from E. E. Shook 82 additional pigs without record of any previous vaccination and which plaintiff failed to vaccinate within 5 days after bringing them on his farm.[9] We agree with defense counsel's observation that when a herd of swine is infected by a fully virulent strain of hog cholera, as certainly occurred on the Denman farm, it is reasonable to infer pigs unvaccinated against hog cholera are more apt to become infected and die than vaccinated pigs. This is undoubtedly true when healthy pigs were administered an effective vaccine. Yet plaintiff's death record (Exhibit 13) indicates no deaths of unvaccinated pigs acquired from a source other than Phil Shook. This omission in itself is a circumstance which assails the accuracy of the death count. Additionally, plaintiff's compilation that 308 pigs vaccinated with Bon-Ecine died was directly impeached, as on cross-examination both plaintiff and Dr. Denman admitted that the carcasses of the first 50 pigs dying (July 1–3) were disposed of before it could be determined that they had a notched upper right ear. This disclosure at trial caused plaintiff to reduce to 258 the number of Bon-Ecine vaccinated pigs dying of cholera. Thus, there are serious contradictions in the evidence, which cause us to give little weight to plaintiff's death count, and this is particularly true in the absence of persuasive proof that the Bon-Ecine vaccinated pigs which died— whether 308 or 258 or any lesser number—were healthy when vaccinated and not already sick from the disease, a point next to be considered in further detail.

Plaintiff also claimed that the Bon-Ecine vaccinated pigs which died were vaccinated at least 6 to 8 weeks prior to death, as determined by the extent of healing of the notched ear of dead animals. It was, of course, vital to show

U. S. Department of Agriculture, and testified for plaintiff at trial, made the following statement:

"If a satisfactory antibody response was not elicited by these animals [447 head, identified as 308 Bon-Ecine vaccinated pigs and 139 Phil Shook pigs] as a result of vaccination a situation of non-immune animals co-mingling with recent MLV vaccinates would have existed on these premises. If this were the case, as strongly suggested by the history of this outbreak, it *could be speculated* the outbreak occurred as a result of non immune pigs co-mingling, and thereby contracting, hog cholera from pigs which had been recently vaccinated with a non-killed hog cholera virus product." (Emphasis added).

9. The evidence is not clear whether these 82 pigs were included in the 1150 pigs vaccinated with Certigen on July 19, which was the 6th day after their arrival on plaintiff's farm.

that the pigs were healthy when vaccinated, and had not been exposed to any contact with cholera-infected pigs, and the required three weeks had elapsed from vaccination date to achieve permanent immunity. Both plaintiff and his son, Dr. Denman, testified that all pigs acquired from neighbor-producers unmarked by ear notch indicating no previous vaccination by Dr. Denman were, without exception, vaccinated with Bon-Ecine within 24 hours after their arrival on plaintiff's farm and before commingling with the herd.

Defendants vigorously challenged the above testimony by placing in evidence plaintiff's answers to interrogatories which showed the dates and numbers of pigs acquired by each private purchase and also the dates and number of pigs of each vaccination by Dr. Denman on plaintiff's farm during the four-month period prior to the cholera outbreak. These answers revealed that from March 11 to July 8 a total of 360 pigs were vaccinated by Dr. Denman on plaintiff's farm on seven widely separated occasions shown in the margin.[10] These time intervals assume great significance since plaintiff purchased pigs in 5 separate transactions covering more than a month's span before the April 11 vaccinations, 7 transactions in April over a 3-week period before the May 6 vaccinations, 9 transactions in May over a 30-day space before the June 7 vaccinations, 3 transactions in June over one week before the June 14 vaccinations, 6 transactions in June over a week before the June 19 vaccinations, 1 transaction in June two days prior to the June 24 vaccinations and 3 June transactions over a two-week period prior to the July 8 vaccinations. Taken at their face value, this record data clearly refutes the testimony that the 24-hour vaccination practice was observed at all times. Of

even greater importance, this information strongly suggests the likelihood that a considerable number of pigs vaccinated on plaintiff's farm in the months of June and July were exposed to other animals actively infected with hog cholera and were themselves sick from disease at vaccination.

Dr. Denman attempted to explain these discrepancies by saying that the vaccinations done for his father were recorded periodically rather than on the actual dates performed. We note that the veterinarian maintained a daily record of all veterinary services rendered to his clients but these were not introduced. A daily record only for one day, June 17, was placed in evidence, not by plaintiff but by defendants for purposes not presently material. Because the veterinary records are not before us, we may not speculate whether they might corroborate the testimony relating to vaccination of all pigs within 24 hours after purchase. We also note the almost complete absence of records establishing a history of Dr. Denman's vaccination of pigs for other clients who later sold them to plaintiff. This number so purchased we calculate to be at least 556 pigs, exclusive of 140 Phil Shook pigs and 360 pigs vaccinated on plaintiff's farm. If and when vaccinated, these pigs had to be vaccinated elsewhere than on plaintiff's farm. Dr. Denman attempted to account for these 556 pigs by stating that such pigs were vaccinated on neighbors' farms destined for shipment to plaintiff, in which event the producer would be billed for the vaccination. Obviously, the witness could not recall from memory, without the aid of records, the dates and number of pigs involved in any such vaccinations, but corroborative records, if any, were not produced by the witness, nor any reason assigned for not disclosing their con-

10.

| Date | Number vaccinated |
|------|-------------------|
| 4–11 | 50 |
| 5–6 | 50 |
| 6–7 | 105 |
| 6–14 | 30 |
| 6–19 | 60 |

| Date | Number vaccinated |
|------|-------------------|
| 6–24 | 35 |
| 7–8 | 30 |

This same data is confirmed by Dr. Denman's account with plaintiff (Ex. 11).

tents. Once again, we are not persuaded that all pigs acquired from other producers were timely vaccinated, if indeed they were vaccinated, before they were introduced into plaintiff's herd.

In sum, plaintiff has failed to carry the burden of proving by a preponderance of the credible evidence that the Bon-Ecine was a defective product, and from the entire evidence the court holds that the 308 pigs dying of hog cholera, which plaintiff would attribute to a defective product, died because they were not timely vaccinated, if vaccinated at all. We are compelled to reach this conclusion on the basis of the weight of the entire evidence, from which it follows that plaintiff is denied recovery.

Let a judgment dismissing the complaint with prejudice be entered.