## ABBOTT LABORATORIES v. LAPP.

### No. 5346.

Circuit Court of Appeals, Seventh Circuit.

June 15, 1935.

Rehearing Denied July 19, 1935.

---

Ralph F. Potter, Leslie H. Vogel, and E. Douglas Schwantes, all of Chicago, Ill., for appellant.

Weymouth Kirkland and Jay Fred Reeve, both of Chicago, Ill., and Samuel D. Jackson, of Fort Wayne, Ind., for appellee.

Before SPARKS, FITZHENRY, and ALSCHULER, Circuit Judges.

SPARKS, Circuit Judge.

By this action appellee sought damages from appellant on account of personal injuries alleged to have been sustained by him by reason of hypodermic administration to him of a medical product of appellant, known as Lactigen. In accordance with the jury's verdict, judgment was rendered for appellee in the sum of $10,000, and from that judgment this appeal is prosecuted.

Appellee based his negligence charge on two grounds: (1) That in manufacturing the Lactigen administered to him, appellant negligently mixed therein germs known as streptococci and staphylococci; (2) in failing to warn the user that when Lactigen was coagulated, as this was, it was filled with dangerous bacteria and therefore unsafe to use.

The nature of the issues requires that a rather full statement be made as to the character of Lactigen, the method of its preparation by appellant, and the purposes thereof, the method of its administration by appellee's physician and the results of it, together with the scientifically approved methods of both the manufacture and the administration of that medical product.

· Lactigen is sterilized skimmed milk. It has been manufactured by appellant since about 1912, in response to a demand of the medical profession for a sterile product instead of commercial pasteurized milk which previously had been employed. Up to March, 1931, appellant's output had been more than 100,000 units, with no unfavorable results reported. The object of the sterilization is to destroy all bacteria known as streptococci and staphylococci. Those minute organisms are usually present upon and in the human skin; they are floating in the air, in milk, and in some waters, and in food and soil; they are frequently exhaled with the breath and are found almost everywhere. There are forty-eight species of streptococci, and eighteen or twenty species of staphylococci. Certain kinds of each of these bacteria are pathogenic, or disease-breeding, and others are not, and are known as non-pathogenic. The pathogenic species, on the other hand, may or may not be virulent, and unless they are, they will not produce disease. None of either bacteria are harmful when received into the human body unless they are alive. They can not be observed with the naked eye, and while it is possible by microscopic examination to distinguish streptococci from staphylococci, yet such examination will not disclose whether they are alive or dead, virulent or non-virulent. Those facts can only be determined by the results of the injection of the bacteria into animals.

Appellant uses the following method in preparing its product: Fresh pasteurized skimmed milk received at the laboratories early in the morning is first run through a clarifier to remove suspended matter by centrifugal force. The liquid is then poured into small glass containers or ampoules previously sterilized by heat. The ampoules are bottle-shaped, rounded at the bottom and little more than one-half inch in diameter by about one and three-quarters inches in length, with an upward extending neck of one-eighth inch diameter, and one-quarter inch in length. After five cubic centimeters of the liquid are placed in each ampoule, it is hermetically sealed in a flame. The ampoules are then placed in a wire basket and subjected to a heat, under pressure, of 100 degrees Centigrade or 212 degrees Fahrenheit, in a steam sterilizer. That process is continued for twenty-two minutes each day for four successive days, after which three per cent of each lot so sterilized are selected at random for bacterial testing in the following manner:

Fermentation tubes are filled with fresh glucose bouillon which is used as a culture

medium. The tube and its contents, after being heated to drive off the oxygen, are then sterilized and tested for sterility by being placed in an incubator for seventy-two hours. After cooling, five drops of the contents of each ampoule to be tested are placed in one fermentation tube and ten or twenty drops are placed in another in order to make two cultures from each ampoule. The tubes are then placed in an incubator at a temperature of thirty-seven degrees Centigrade and examined at the end of one, two, four and seven days. If no growth is found, the entire lot is passed as sterile. If more than one test tube shows organic growth, the entire lot is discarded. If one shows such growth, twice as many ampoules are selected for reexamination and all put through the same test. If more than one of these shows growth, the entire lot is discarded.

If this test is successfully met, the ampoules are then tested as to whether any of them contain minute cracks through which living organisms might enter. That is done by immersing them in a blue liquid in an air tight container from which the air is exhausted. If there is a crack in any ampoule the air from it will likewise be exhausted. When air is readmitted into the container, the air pressure on the surface of the liquid will force the blue solution into any ampoule which is cracked, and such ampoule is discarded. These modes of testing are approved by Government regulations, and by the Hygienic Laboratory, and they comply with the generally recognized standards. The ampoules surviving the tests are then examined by two inspectors and are labeled and marketed in boxes, each of which contains six. Samples from each lot treated and tested are preserved. One box was preserved from the lot from which the injection in controversy was taken. After the injury complained of, the contents of each of the six ampoules thus preserved were tested by appellant's bacteriologist and found by him to be sterile and not coagulated.

Uncontroverted evidence disclosed that Lactigen, like any other milk, becomes coagulated under certain conditions, and, as a matter of precaution, when in that condition it should not be administered hypodermically, because such coagulation might be caused, although not necessarily so, by the presence of pathogenic, virulent streptococci or staphylococci. Coagulation is caused by the presence of acid in the milk, and acid may be produced by bacteria or otherwise. Even though the coagulation be produced by bacteria, yet its injection into the human body would be harmless unless the bacteria thus injected were both pathogenic and virulent. It was further disclosed and not disputed that where there is infection in the human body, either determined or undetermined, the introduction of a perfectly sterile foreign substance may, and frequently does, light up the infection and create an abscess at the point of injection, the reaction being brought about by drawing the bacteria from the focus of infection to the trauma caused by the injection. It was further disclosed that a severe infection indicates a human to human contamination rather than one through artificial means.

The immediate facts relating to the incident in question are as follows: The Wayne Pharmacal Supply Company of Fort Wayne dealt with appellant for many years, and early in 1931 had on hand a supply of Lactigen, purchased from appellant, which it held for sale for use by physicians only. In February and March, 1931, appellee, aged fifty-nine years, was a patient of Dr. Titus, a practicing physician of Fort Wayne, for pains in the back and shoulders and a pus infection of the kidneys. Dr. Titus had purchased Lactigen from the Wayne Company and in the course of his treatment of appellee had injected it hypodermically into appellee's arm on three occasions at intervals of one week, the last treatment being at seven o'clock P. M. on March 3, 1931. On that evening the doctor had two ampoules of Lactigen left from a box of six which he had purchased from the Wayne Company. The contents of two of the other four had been administered to appellee as above stated, and the other two had been administered to other patients, all without injury to appellee or the other parties. Appellee up to that time had improved under the treatment. Preliminary to the last injection, the doctor washed his hands in soap and water and alcohol. He washed the ampoule with alcohol on sterile cotton, and he cleansed with alcohol that part of the arm where he afterwards inserted the hypodermic needle. With a pair of forceps, which, together with the hypodermic syringe and needle, he had sterilized in an electric sterilizer, he knocked off the top of the ampoule, loaded the syringe from its contents, and injected it into the arm. There-

upon, he again wiped off the punctured area with alcohol. Those acts, the record discloses, utilized the approved methods, practices and equipment then in use by the medical profession. The liquid in that ampoule looked the same as other Lactigen which the doctor had previously used. About one-sixteenth of an inch of Lactigen remained in the ampoule after the injection, and the open ampoule was deposited on a tray in the office, where it remained until shortly after nine o'clock that evening. The contents of the remaining ampoule were subsequently administered to three other patients that evening before nine o'clock, without unfavorable results. In that ampoule there was left about one thirty-second of an inch of Lactigen. Shortly after nine o'clock, before closing his office, the doctor observed both ampoules with the amounts of Lactigen remaining in them, and noted that the liquid in each was coagulated. The record discloses, and it is not disputed, that bacterial contamination will not produce visible coagulation in milk or Lactigen sooner than twenty-four hours. Upon the discovery of coagulation the doctor placed adhesive tape, taken from a can containing formaldehyde, over the openings in the ampoules. They remained upon his desk for several days, in the room in which he treated his patients, many of them for various infections.

Within forty-five minutes after appellee's last injection he suffered pain in his arm, and it began to swell the next morning. He worked all day and called the doctor in the evening. On March 6, the arm was badly swollen and he was sent to the hospital where incisions in the arm were made and drains were inserted. He remained in the hospital until May 4. At the time of trial the shoulder of his affected arm was about one and one-half inches higher than the other, and the upper arm was one and a half inches less in circumference than the other, and his heart was enlarged. Those physical impairments were attributed by the medical testimony to the infection of his arm which had its inception in the puncture of the hypodermic needle. On March 6, serum from appellee's infected arm was microscopically examined and found to contain pus cells and streptococci and staphylococci. Within the next day or two the two ampoules whose opened ends had been covered with adhesive tape were taken by Dr. Titus from his office to the hospital for examination.

The next day cultures were made from the coagulated liquid remaining in each of those ampoules for the purpose of developing any bacteria which they might contain. Twenty-four hours later they were microscopically examined and were found to contain streptococci and staphylococci. On April 25 appellee's blood was microscopically examined and found to contain bacteria of the same character.

The contested issues are based upon appellant's following contentions: (1) The court should have directed a verdict for appellant; (2) the verdict was entirely based on conjecture and surmise, and on presumptions which in turn were based on other presumptions; (3) the law imposed no duty upon appellant to warn physicians, presumed to be skilled in medical practice, that coagulated milk should not be hypodermically administered.

■ It is claimed that the verdict should have been directed for appellant because there was no competent evidence adduced that appellant's product caused the injury. The evidence with certainty established the fact that there was coagulation in the Lactigen before the ampoule was opened, because it was observed with the naked eye within two hours afterwards, and the uncontradicted evidence disclosed that coagulation in such cases is never visible to the naked eye sooner than twenty-four hours. It is urged, however, that though coagulation were in the Lactigen before the ampoule was opened, yet that fact would not conclusively prove that it was caused by streptococci or staphylococci, because coagulation may result from other causes. It is further urged that even though those bacteria were then present in the liquid and caused the coagulation, yet that fact would not conclusively prove that they caused appellee's injury unless it were further proved that the bacteria were of a pathogenic and virulent nature. Both of those arguments are sound, yet if they are followed to an ultimate conclusion, it would require appellee to prove the allegations of his declaration beyond a reasonable doubt. He is required to prove them, however, only by a preponderance of all the evidence, and that evidence may be either direct or circumstantial. How is it to be determined whether certain bacteria are pathogenic and virulent? Scientists determine that fact by injecting the fluid which contains the bacteria into an animal such as a guinea pig or rabbit. If the result proves harmful,

such as was produced by the injection into appellee's arm, the bacteria are said to be pathogenic and virulent, and the liquid is discarded. Owing to the omnipresent character of such bacteria, we assume that it was possible in the administration of the hypodermic injection in appellee's arm that other harmful bacteria of the same nature, which were not in the liquid, might have caused the infection. They might have come from the air, the hands, the needle, the flesh of appellee, or they might have been in his body. We see no reason why the same possibilities would not prevail in the inoculation of a guinea pig. In performing that inoculation, we assume that no more care is exercised than is employed in administering it to a human being, and yet in the case of the guinea pig, under the conditions mentioned, where the reaction is harmful, the bacteriologist concludes that it was caused by pathogenic, virulent streptococci or staphylococci present in the liquid taken from the ampoule. Obviously that conclusion is largely based on circumstantial evidence, because neither the eye nor the microscope will disclose the ultimate fact.

The same uncertainty exists in the instant case as to whether the harmful bacteria were in the Lactigen at the time it was taken from the ampoule by means of the hypodermic syringe. Under the evidence, we are not permitted to deny, and we must assume, that the Lactigen was coagulated before the ampoule was opened. It must also be admitted that the presence of acid in milk will always cause coagulation, and that the presence of streptococci and staphylococci in milk, if they are alive, will always produce acid, although other things may produce the acid. When the ampoule was opened the Lactigen was immediately injected into appellee's arm, and within forty-five minutes of that time harmful results followed which continued for several months thereafter. Those results were precisely the same as those which pathogenic and virulent streptococci and staphylococci produce. Further support of the jury's finding was furnished by the results of later tests of the liquid remaining in the ampoule, as well as pus taken from appellee's infected arm, and also his blood, all showing the presence of streptococci and staphylococci. However, appellant urges, with much emphasis and considerable plausibility, that the court erred in admitting testimony of the results

of those tests because of the lapse of time after the injection, and the possibility that the bacteria had come from other sources. A perusal of the expert testimony, however, in connection with all the other evidence, convinces us that the results of those tests were admissible, and that their weakness, if any, lies in their probative value.

On cross examination, one of appellant's experts stated: "If a man in a hospital has a sample of serum taken from his body, and the man is running a temperature from sub-normal to 104, and that condition persists for months during which period he is delirious and at the time the specimen is taken from him he is in such a condition that multiple incisions are made over his arms, chest and shoulders * * * and down into the muscle for the purpose of draining the serum, that the serum is placed under microscopic examination, and the only germs found are streptococcus and staphylococcus; practical judgment would be it was one or the other, or a mixed injection, of the two organisms, that is of the virulent type." He further added that there would be no occasion for further testing it upon a rabbit because the patient would correspond to the rabbit. This witness was a bacteriologist of note who also had the degree of Doctor of Medicine. He was examined at length on direct and cross-examination and also by hypothetical questions which covered the facts as stated by both the appellant and appellee. On cross-examination he was asked the following question: " * * * from a practical standpoint * * * if you learned that the patient * * * had come into the hospital under these circumstances; he had been in a doctor's office; the doctor had injected Lactigen into his arm; he had sterilized his hands, the patient's arm, and the syringe, before injecting it, and then within a period of two hours after the injection, he happened to look at this ampoule from which he had withdrawn this substance and found * * * a certain amount of it at the bottom coagulated; then if you learned further within forty-five minutes, the patient's arm began to hurt at the point of administration, * * * and began to swell, * * * and continuously swell until it looked like it was about to burst, and * * * then a few days later, with a fever and delirious and in the condition I have described, they withdraw the substance and examine * * * (the contents of the ampoule)

under a microscope, and find in it streptococcus and staphylococcus germs which they observed under a microscopic examination of the serum taken from the patient's arm. * * *" The question further stated that the patient had worked until five o'clock on the day following the injection, though his arm pained him severely; that he was given the injections for the previous two weeks because he had been suffering from either neuritis or arthritis which the doctor said was caused by pyelitis. "Now, from a practical standpoint, if you found those things first, wouldn't you be certain from a medical standpoint that the cause of that infection in the patient's body was the streptococcus and staphylococcus germs found in the ampoule contents? * * * I am speaking with a reasonable degree, not an absolute degree, but with a reasonable degree of certainty." The answer was: "I misunderstood you, I thought you put the question on more certain grounds than that. That would be a reasonable assumption. That the organisms found in the case had gotten in from this but it would not be a guarantee." That answer, in connection with all the other evidence in the case, we think justified the trial court in submitting the case to the jury. It is not within our province to weigh the evidence, but it is our duty to determine whether the verdict is supported by substantial evidence. We think it is, and we are not permitted to substitute a conclusion different from that of the jury.

Appellant argues that by introducing evidence that the infection could have come from other sources, namely, from bacteria on appellee's own arm, or from the infection proved to have been already present in his own body, and for which he was receiving the treatment, it overcame the highly conjectural evidence offered by appellee, hence appellee did not prove that appellant's negligence was the proximate cause of appellee's injury. We can not agree with this. Appellant cites six cases to sustain the proposition that where the evidence shows that the injury to the plaintiff was due to one of two or more causes, for only one of which the defendant may be responsible, a verdict for the plaintiff will not be sustained. See Tremaine v. H. K. Mulford Co., 317 Pa. 97, 176 A. 212; Minneapolis General Electric Co. v. Cronon (C. C. A.) 166 F. 651, 20 L. R. A. (N. S.) 816; Brown v. H. K. Mulford Co., 198

Mo. App. 586, 199 S. W. 582; Conreaux v. Industrial Commission, 354 Ill. 456, 188 N. E. 457; Stevens v. The White City, 285 U. S. 195, 52 S. Ct. 347, 76 L. Ed. 699; Eggen v. United States (C. C. A.) 58 F. (2d) 616. In the Tremaine Case, where plaintiff's decedent died after an injection of rabies vaccine, the manufacturer of the serum was held not liable, there being no testimony as to the serum, and no analysis of it. In the Missouri case, a hog cholera case, it was shown that the serum was a very dangerous one, being composed of two parts, one of which was highly poisonous, and to be administered only in conjunction with the other in certain prescribed proportions. It was sold only to druggists and veterinarians. A full warning was given on the label, which stated that it was to be administered only by qualified veterinarians, and complete instructions were given for the use of serum. No evidence was introduced to show that the serum was not as represented. In the Supreme Court case, Stevens v. The White City, the owner of a boat delivered to a tug for towing sought to hold the tug liable for damages to the tow without any evidence whatsoever as to their cause, and the Court held that a prima facie case was not made out by proof merely of the fact of an accident while the boat was in the possession of the tug. In the Minneapolis Electric Company Case, where a decedent was electrocuted by seizing a live wire, it was shown that the Electric Company had safely installed the wiring in premises several years before the accident, thereupon turning it over to the owner who, in the meantime, had so changed the condition of the installation as to render it dangerous. It was held that under those circumstances the company had not been proved negligent. The court said: "A plaintiff is required to develop a theory upon which the actionable negligence of the defendant is claimed, and such theory must be supported by tangible evidence. The jury may not be indulged, against visible facts contradicting it, to guess that it was otherwise." We think appellee met that requirement in this case by the evidence he introduced as to the presence of bacteria in the ampoule whose contents were administered to him, which bacteria could have caused the injury complained of. It appears that all the cases cited by appellant differ from the one at bar in that here the appellee introduced positive evidence that the preparation manufactured,

sold and distributed by the appellant was in a dangerous condition at the time it was used on appellee, and that both his own and appellant's witnesses testified that that condition could have caused the injury complained of. Under those facts, we think the court could have had no right to instruct the jury to return a verdict for appellant.

It is further urged by appellant that the court erred in permitting the jury to determine whether appellant was guilty of negligence in not warning the doctor to refrain from administering the Lactigen if coagulated, the doctor having testified that he knew that fact. Sometimes it is well to have our attention called to the things we know best, and that is well illustrated by this doctor's testimony. With knowledge that coagulated Lactigen should not be administered, he did not observe the contents of the ampoule, with that in mind, before using it. The court intimated no opinion as to whether appellant's failure to give the doctor warning would or would not constitute negligence. He merely submitted it as a question of fact for the jury's determination. In this there was no error.

Judgment affirmed.